137 F.2d 233 (1943)
ARMOUR & CO. OF DELAWARE
v.
BROWN, Price Adm'r.
Nos. 26-28.
United States Emergency Court of Appeals.
Heard July 8, 1943.
Decided August 6, 1943.
*234 Donald R. Richberg, of Chicago, Ill. (George E. Leonard, Jr., of Chicago, Ill., on the brief), for complainant.
William R. Ming, Jr., of Washington, D. C. (George J. Burke, Gen. Counsel, Thomas I. Emerson, Associate Gen. Counsel, Nathaniel L. Nathanson, Asst. Gen. Counsel, and Carl H. Fulda and Henry S. Sellin, Attys., Office of Price Administration, all of Washington, D. C., on the brief), for respondent.
Before MARIS, Chief Judge, and MAGRUDER and LAWS, Judges.
MAGRUDER, Judge.
In No. 26, Armour & Company claims to be aggrieved by the Price Administrator's order issued February 13, 1943, denying its protest against Order No. 1 under Maximum Price Regulation No. 169, which latter order denied an application by complainant, filed August 18, 1942, seeking adjustment of maximum prices for carcass beef to be delivered to the United States under certain contracts. In No. 27, Armour claims to be aggrieved by an order issued March 6, 1943, denying its protest against Order No. 20 under Maximum Regulation No. 169, which latter order denied two similar applications for adjustment filed October 30, 1942, and November 7, 1942, respectively. In No. 28, Armour claims to be aggrieved by an order issued March 8, 1943, denying its protest against Order No. 8 under Maximum Price Regulation No. 169, which latter order denied a similar application for adjustment filed September 8, 1942. By order of this court the three cases were consolidated for purposes of hearing and disposition. They present the same questions, and hereafter in this opinion reference will be made only to the record in No. 26.
A somewhat detailed recital of the sequence of procedural steps is necessary in order to make clear the narrow issue now properly before us for decision.
Maximum Price Regulation No. 169, Beef and Veal Carcasses and Wholesale Cuts, was issued June 19, 1942, to become effective July 13, 1942. 7 F. R. 4653. The maximum price for each grade of *235 each beef or veal carcass was fixed at the highest price actually charged by the seller during the base period March 16 to March 28, 1942, at or above which at least 30% of the total weight volume of the sellers' sales of carcasses of the same grade were made during such period. Meat prices were sought to be controlled at the packer level without maximum price control of livestock prices. It was thought by the Administrator that control of the prices of live meat animals would present serious administrative problems in view of the number of sellers, their wide distribution, and the difficulties of grading beef on the hoof. Further, it was considered that such control was not necessary in order to assure the packers a generally fair and equitable margin of profit because of the predominant influence of the wholesale price of meat in determining the level of livestock prices which resulted from the fact that the domestic meat packing industry is the sole outlet for beef cattle.[1]
Section 1364.60 of the regulation provides that the office of Price Administration may by order adjust any maximum price for any seller who petitions for such adjustment in accordance with Procedural Regulation No. 1, in any case in which such seller shows:
"(1) That such maximum price causes him hardship and is abnormally low in relation to the maximum prices established for competitive sellers;
"(2) That establishing for him a maximum price bearing a normal relation to the maximum prices established for competitive sellers will not cause or threaten to cause an increase in the level of retail prices."
Armour did not petition for adjustment under this provision; and there are no facts in the present record indicating that it would have any case for adjustment thereunder.
On July 14, 1942, the Administrator issued Supplementary Order No. 9, applicable generally to maximum price regulations theretofore issued or to be issued thereafter. 7 F. R. 5444. This order, so far as now material, reads: "Any person who has entered into or proposes to enter into a contract with the United States or any agency thereof, * * * who believes that a maximum price established by any price regulation of the Office of Price Administration impedes or threatens to impede production of a commodity * * * which is essential to the war program and which is or will be the subject of such contract * * *, may file an application for adjustment of such maximum price in accordance with Procedural Regulation No. 6. Upon the filing of an application for adjustment and pending the issuance of an order granting or denying such application, contracts * * * may be entered into, or offered to be entered into, and deliveries may be made, at the price requested in such application. If, however, the order issued denies the application in whole or in part, the contract price shall be revised downward to the maximum price ordered, and if any payment has been made at the requested price, the applicant may be required to refund the excess."
Procedural Regulation No. 6, above referred to, was issued July 1, 1942. 7 F. R. 5087. It prescribed the form of application to be made under Supplementary Order No. 9, which form called for precise details of cost data, also balance sheets and income statements for the preceding five years. Generally, applications were to be filed with the appropriate regional office, but by subsequent amendment issued July 22, 1942 (7 F. R. 5664), applications for adjustment under Maximum Price Regulation No. 169 and certain other enumerated regulations were required to be made direct to the Office of Price Administration in Washington. It was provided that "Any Government agency may appear as an interested party in the case of any such application." An order by the Administrator denying any application for adjustment was deemed to be an order under § 2 of the Emergency Price Control Act, 50 U.S.C.A. Appendix § 902 which the applicant was entitled to protest under § 203(a), and to have reviewed by this court under § 204(a) in case the protest were denied. 56 Stat. 24, 31, 50 U.S.C.A. Appendix §§ 923(a), 924(a). Consequently Procedural Regulation No. 6 contained the following provision: "Any applicant *236 whose application for adjustment is denied in whole or in part by the Administrator may, within sixty days after the issuance of the Administrator's order finally denying such application, file a protest against such order in accordance with the provisions of Procedural Regulation No. 1 (7 F. R. 971)."[2]
The special adjustment provision in respect of commodities or services to be furnished under Government contract was originally made in Supplementary Regulation No. 4 to the General Maximum Price Regulation. The statement of considerations involved in the issuance of Supplementary Order No. 9 incorporates by reference the reasons set forth in the statement of considerations accompanying Supplementary Regulation No. 4, which are said to be "equally applicable with respect to commodities or services covered by any other Regulation heretofore or hereafter issued by the Office of Price Administration." O. P. A. Service 2:458-B. In the statement of considerations accompanying Supplementary Regulation No. 4, after referring to the fact that in general sales to the Government of any commodity covered by the General Maximum Price Regulation must be made at applicable maximum prices, the Administrator stated: "It is recognized that there will be cases in which it may be necessary to make adjustments from established maximum prices for a particular seller for whom such prices are unreasonably low. If such seller is engaged in essential war production and has entered or proposes to enter into a Government contract or subcontract, his request for relief must be handled as expeditiously as possible lest delay interfere with procurement." Id. at 11:260.
Pursuant to Supplementary Order No. 9 and Procedural Regulation No. 6 Armour on August 18, 1942, filed with the Office of Price Administration its application, dated August 14, 1942, "for adjustment of the maximum price established for Carcass Beef, which will be the subject of Government Contract No. W 2283 QM 1049, opening August 15, 1942, at Chicago Quartermaster Market Center, and for Government contracts opening weekly hereafter at Chicago Quartermaster Market Center." The application set forth that under Maximum Price Regulation No. 169 the applicant's maximum price per cwt. carload lots f.o.b. Chicago was $19.32. Attached to the application was Exhibit A showing "actual figures from actual operations as compiled by our accounting department." This exhibit shows $21.24 as Armour's total dressed cost f.o.b. Chicago of Army Grade C dressed beef (O. P. A. commercial grade A) based on cost of cattle purchased July 21, 1942, adjusted to market as of August 13, 1942, with full credit for by-products  indicating an actual loss of $1.92 per cwt. on the pending contracts with the Government. Applicant requested to be allowed to charge a price of $21.66 f.o.b. Chicago, representing its actual cost with 2% profit added. It is recited in the application that Armour will bid at such prices on the proposals for carcass beef as requested by the Chicago Quartermaster Market Center "until further notice or until new application is made and pending final action by the Office of Price Administration." As a reason for requesting the price adjustment, applicant states: "Obviously, no seller can continue indefinitely to furnish the large amount of carcass beef required by the Army at a substantial loss. The armed forces must be fed and the applicant desires to cooperate fully in that task, but should not be asked to do so at a loss. Notwithstanding applicant's desire to cooperate with the armed forces it has had several priorities served *237 upon it requiring vast amounts of carcass beef for the armed forces and the maximum price, therefore, should be adjusted on an equitable basis."
The application was consolidated with a group of some thirty similar applications by other packers. All of the applications were denied by the Administrator on September 15, 1942, in Order No. 1 under Maximum Price Regulation No. 169. The order also provided that applicants who had received payment from the Army at the prices requested in their applications should refund the difference between such requested prices and the maximum prices established in the regulation.
In a brief opinion accompanying the order of denial the Administrator said that in the aggregate "the volume of beef, veal, and products involved in the several consolidated Applications herein represents a substantial portion of the nation's meat supply." After referring to the real shortage of meat resulting from greater civilian purchasing power and the diversion of great quantities of meat to satisfy war needs, with the resulting intense competition among the packers for the available live cattle, the Administrator continued in part:
"All of the Applications rest ultimately upon the rising costs of live cattle and the shortage of beef relative to present demand. The Applications do not allege or show the existence of conditions peculiar to the operations of the individual Applicants which are detrimental to the supplying of war needs. The alleged disadvantageous cost situation of which the Applicants complain is due to the increased cost of their raw materials. The underlying grounds of complaint are therefore common to the entire industry, including those firms which are supplying civilian needs as well as the other firms supplying war needs.
"The problems which have arisen because of the desire of sellers to increase or maintain their normal volume of business in order to satisfy all demand or, briefly, the problems of shortage, can neither be solved nor corrected by upward revision of prices established by the Maximum Price Regulation. The granting of the relief sought would only serve to aggravate the problem and set in motion an inflationary spiral which would not alleviate the conditions which the Applicants are encountering but would increase the costs of prosecuting the war and deplete the funds which the Congress has appropriated therefor. Should the Price Administrator grant the increases sought, such action would place all sellers not engaged in supplying the Government at a competitive disadvantage. The Applicants would thus be enabled to bid more for the raw material, thereby driving out of the market those sellers which serve the domestic civilian trade only. Granting the relief would, in the opinion of the Price Administrator, thereby make the application of Maximum Price Regulation No. 169 unfair and inequitable as to all sellers not parties to these Applications for Adjustment. To fulfill his duty under the Emergency Price Control Act of 1942, the Price Administrator must then revise Maximum Price Regulation No. 169 by increasing the ceilings of all other sellers so that a parity is reestablished with the prices increased by reason of the relief sought herein. The relief would be illusory to the Applicants, who would then seek further increases on the same grounds which they now submit. Consequently, the only effect of granting the relief would be to set in motion an uncontrollable trend of price increases, which would force the cost of live cattle higher and constantly raise prices to the Government and to consumers, while depleting the funds appropriated for the prosecution of the war. That result is simply inflation. The appropriate methods for solving the problems created by the shortage and the attendant rise in cattle prices are under consideration and will be put into operation as quickly as the Government agencies concerned can work out the administrative details.
"* * *
"Since the Applications here considered are predicated upon conditions common to the entire industry, and since the price adjustments requested are not calculated to solve the difficulties complained of, it is the opinion of the Price Administrator that relief cannot appropriately be granted under Supplementary Order No. 9 and Procedural Regulation No. 6."
On November 14, 1942, Armour filed with the Administrator its protest against Order No. 1 denying its application for adjustment. The protest makes specific objection that Order No. 1 deprives protestant *238 of its property without due process of law; denies it the equal protection of the laws; results in the taking of its property for public use, without just compensation therefor; is arbitrary and capricious; is based on generalities which have no specific relation to the protestant, nor to the manner in which protestant will be or is impeded in supplying carcass beef essential to the war program; and impedes or threatens to impede production of carcass beef which is essential to the war program. The protest repeated the figures which had been given in the application for adjustment with respect to the disparity between production costs and maximum prices allowable under the regulation. An accompanying affidavit by an accountant in the employ of the company explains the manner in which the costs have been computed. The protest recites that the total quantity of carcass beef Army Grade C shipped pursuant to orders of the Chicago Quarter-master Market Center under the contracts referred to in the application for adjustment is 864,025 pounds, and that during the period August 1, 1942, through October 3, 1942, protestant and its subsidiaries delivered 4,507,983 pounds of Army Grade C carcass beef to the armed forces, while its total deliveries of carcass beef during the same period amounted to 123,646,000 pounds. It is further recited that the contracts were entered into at the direction of the Chicago Quartermaster Market Center of the United States Army, that protestant had been informed that such agency had received authority to commandeer meat and to place mandatory orders for meat and that these powers would be exercised if protestant did not sell and deliver the meat as directed. The protest concludes with a prayer that protestant "be permitted to charge for the Carcass Beef, Army Grade C, delivered to the United States Army through the Chicago Quartermaster Market Center under the contracts listed in Exhibit A hereof, the prices requested in protestant's petition dated August 14, 1942."
The Administrator denied this protest in an order dated February 13, 1943. In an opinion accompanying such order the Administrator asserted that protestant had not shown that the maximum prices established by the regulation impeded or threatened to impede the production of carcass beef of Army Grade C, which is the criterion for adjustment under Supplementary Order No. 9. "In support of its application, Protestant showed only that it was obliged to perform the contracts involved at a loss. There was no allegation or evidence that Protestant suffered any substantial hardship in its over-all operations as a result. To the contrary, it appears that deliveries of carcass beef under the contracts involved here amounted only to a very small fraction of Protestant's total deliveries of carcass beef to the Army and civilian trade. * * * Moreover, although Maximum Price Regulation No. 169 contained a provision for adjustment of individual maximum prices, Protestant made no such application for adjustment of maximum prices established for its commodities supplied for civilian use and did not file a protest to that regulation. Since there is no difference between beef of the same grade supplied to the Army and that supplied to civilian users, there is no justification for allowing Protestant to charge a higher price for sales of beef to the Army." The Administrator's opinion then quoted extensively from his opinion accompanying Order No. 1 denying the application for adjustment. Finally, the Administrator answered protestant's argument that Order No. 1 deprived Armour of its property without due process of law because its products would have been commandeered by the Army if it had not performed these contracts, by asserting that protestant's products "were not requisitioned by the Army, but, rather, were delivered to the Army pursuant to contracts between Protestant and purchasing officers. The Constitution does not guarantee a profit to every individual, and administrative rulings are not invalid merely because an individual, who is subject to a price regulation, may show that the regulation deprives him of a profit."
After the denial of its protest, Armour duly filed its complaint in this court under § 204(a) of the Act. The complaint again recites, and the Administrator's answer thereto admits, that under Maximum Price Regulation No. 169 "complainant had a Maximum Price F.O.B. Chicago, carloads, for Carcass Beef  Army Grade C  of $19.32 per cwt. As of August 13, 1942, this grade of Carcass beef cost complainant $21.24 F.O.B. *239 Chicago * * *. These cost figures give full credit for by-products." Order No. 1 denying complainant's application for adjustment is asserted to be "arbitrary and capricious." The prayers of the complaint are that:
"(1) Order No. 1 under Maximum Price Regulation No. 169 be set aside and held for naught, and
"(2) The order of February 13, 1943, denying complainant's protest be set aside and held for naught, and
"(3) Complainant be permitted to charge the United States Army for the carcass beef involved herein at the prices requested in complainant's application (#3169-58)."
In brief and oral argument before us, complainant insists that the validity of Maximum Price Regulation No. 169 is now properly in issue before this court. It contends "that its application for an adjustment, made in the form duly authorized by Supplementary Order No. 9 and in conformity with Procedural Regulation No. 6, is in effect a specific protest against Maximum Price Regulation No. 169, and such protest was intended to be, and was utilized as, a proper immediate step in obtaining relief from an unjust maximum price regulation." For many reasons this contention is clearly untenable:
(1) If such application for adjustment was in effect a protest against the regulation, then Order No. 1, issued September 13, 1942, denying the application, would be in effect an order denying the protest. Under § 204(a) Armour would have had only a period of thirty days after such denial within which to file its complaint in this court; but the complaint was not filed until March 15, 1943.
(2) As already pointed out, Procedural Regulations Nos. 1 and 6 make a clear distinction between a protest directed against a regulation, and an application for adjustment within the framework of the regulation. Under § 203(a) of the Act, a protest challenging the initial validity of a regulation must be filed within sixty days after the regulation is issued. On the other hand, the Administrator has put no time limit upon the filing of petitions for adjustment; and he has provided that an order denying any such petition for adjustment may itself be the basis of a protest within sixty days after the issuance of such order of denial. A protest against an order denying an application for an adjustment does not open up for review the validity of the regulation itself, but only raises the question whether the Administrator was arbitrary and capricious in concluding that the applicant had failed to make out a case within the terms of the applicable adjustment provision.
(3) The application for adjustment in this case does not even remotely purport to be a protest against the regulation itself. It contains no specific objections to any provision of the regulation, as required by § 203(a) of the Act, and merely asks for an adjustment pursuant to Procedural Regulation No. 6, of maximum prices in respect of carcass beef to be furnished to the Government under certain contracts.
(4) Complainant's protest, filed with the Administrator on November 14, 1942, is directed only against Order No. 1, not against the regulation itself; and the prayer of the protest is merely that protestant be permitted to charge for carcass beef delivered to the Army the higher prices requested in protestant's petition for adjustment. Under § 204(a) of the Act this court cannot consider any objection to a regulation unless such objection shall have been set forth in the protest.
(5) Not even in its complaint filed in this court does Armour challenge the validity of Maximum Price Regulation No. 169. The complaint is directed against Order No. 1 denying its application for adjustment and against the order of February 13, 1943, denying its protest against said Order No. 1. In the complaint, we are asked merely to set these two orders aside and to permit complainant to charge the Army the higher prices requested in its application for adjustment; we are not asked to set aside the regulation itself, either in whole or in part.
(6) Apart from all other objections, the record before us does not contain the economic data upon which the Administrator acted in formulating the regulation itself. Such materials were not included in the transcript filed by the Administrator, presumably because he did not regard them as material to the issues raised by the protest proceedings and by the complaint. See § 204(a) of the Act. *240 Complainant did not move under Rule 15(d) of our rules, 50 U.S.C.A. following section 924, to have the transcript supplemented by the inclusion of the economic data and other facts of which the Administrator took official notice in formulating Maximum Price Regulation No. 169 and without which we are in no position to pass a rational judgment upon the validity of the regulation.
Complainant suggests that the Administrator is inconsistent, on the one hand, in arguing that Order No. 1, denying the application for adjustment, must be viewed against the background of Maximum Price Regulation No. 169, and that his action was reasonable in the light of that regulation and, on the other hand, in insisting that the validity of the regulation is not in issue before us. We do not perceive the inconsistency. Complainant did not file any protest against the regulation, and is not now in a position to challenge its validity. For the purposes of this case, the validity of the regulation must therefore be assumed. The validity of Order No. 1 denying the application for adjustment must be judged in the light of that assumption.
Supplementary Order No. 9 was designed to obviate delays in Government procurement of commodities essential to the war program. It was an invitation to sellers as to whom the established maximum prices were "unreasonably low" to apply for adjustment upwards of the maximum prices of commodities to be sold to the Government, with permission to contract with the Government at such higher requested prices, subject to appropriate refund if the application for adjustment were subsequently denied by the Administrator. So far as government contracts are concerned, Supplementary Order No. 9 seems to make provision for relief of sellers who may have lost the right to challenge the validity of the regulation itself, or who may not be entitled to relief under the general adjustment provisions of the regulation, but whose continuing output is needed by the Government and is not likely to be forthcoming at prices which do not meet the costs of production.
In its application for adjustment filed under Supplementary Order No. 9, Armour showed  and the facts are admitted by the Administrator  that the prices fixed by Maximum Price Regulation No. 169 would require it to produce and sell to the Government at a substantial loss the large quantities of carcass beef wanted by the Army. Prima facie, this showing would seem to present a situation, contemplated by Supplementary Order No. 9, where an established maximum price "impedes or threatens to impede production of a commodity * * * which is essential to the war program and which is or will be the subject" of a contract or contracts with the Government. It is hardly an answer to say, as the Administrator does, that Armour failed to allege or show the existence of conditions peculiar to it which were detrimental to the supplying of war needs. The adjustment provision contains no such limiting requirement. Indeed, if the underlying grounds for seeking the adjustment are "common to the entire industry" this would seem to make the case even stronger for a finding that the established maximum prices impede or threaten to impede the production of carcass beef, which, as we have seen, is the criterion for adjustment as provided in Supplementary Order No. 9. Nor can much significance be attached to the point that Armour may still be making a profit in the "over-all operations" of its ramified business; this in itself, under normal circumstances, would hardly assure the continued production of an item that can only be sold at a loss.
The Administrator argues that to grant the requested adjustments would bring only "illusory" relief to the applicant, would aggravate an inflationary spiral,[3] and would undermine Maximum Price Regulation No. 169 in its general application. But the relief is not illusory so far as it would permit Armour to fill these particular Government contracts without taking a loss. An adjustment provision in a regulation has the force of law, becomes one of the rules of the game, so to speak. If an applicant makes out a case within the framework of the adjustment provision, the denial of relief by the Administrator must be deemed an arbitrary act. The Administrator is no less obligated to give the relief called for *241 by the adjustment provision because of his discovery, through experience, that the adjustment provision is ill-advised and inappropriate and embarrasses the general administration of the regulation. If such has proved to be the case, the thing to do is to revoke or amend the adjustment provision. In fact, that is just what the Administrator did, several weeks after he had denied Armour's protest. By Revised Supplementary Order No. 9, issued May 11, 1943 (8 F. R. 6175), the adjustment provision for Government contracts as provided in Supplementary Order No. 9 was specifically made inapplicable to Revised Maximum Price Regulation No. 169. In a statement of considerations explaining this action the Administrator pointed out that over two hundred applications had been filed under Supplementary Order No. 9 for adjustment of prices covered by Maximum Price Regulation No. 169; that such applications had been granted "in only a handful of instances, of negligible importance." O. P. A. Service 2:458-D. Further, the Administrator stated, "To avoid a wholly futile administrative burden of substantial magnitude, and to prevent continuous disturbance of the meat price structure, meat must be withdrawn from the provisions of Procedural Regulation No. 6. Relief from that burden will facilitate adequate corrections on an industry-wide basis of any impediments to war procurement which can be made consistently with the maintenance of price control." Id. at 2:458-E.
In his opinion accompanying the order denying Armour's protest the Administrator stated: "A protest against an order denying an application for an adjustment can question only the determination that the applicant has failed to show that it comes within the terms of the applicable adjustment provision." This is a correct statement of the issue in the present case. But we do not find that the Administrator focussed on this issue either in his opinion accompanying the order denying the adjustment or in his opinion accompanying the order denying the protest. In neither place does he give any reason for his conclusion that under the admitted facts, which he says are "common to the entire industry," Armour has failed to show "that the maximum prices for carcass beef established by Maximum Price Regulation No. 169 impeded or threatened to impede the production of that commodity." The assurance that the Administrator had under consideration the revision of the regulation to take care of the difficulties complained of does not negative, indeed rather reinforces, the inference naturally to be drawn from the facts stated in Armour's application for adjustment that the then existing maximum prices impeded or threatened to impede the production of carcass beef.[4] The Administrator does not make the argument that Armour, and the other packers, would probably continue to produce carcass beef and sell it to the Government even at a loss, either for patriotic reasons or to avoid a seizure of its existing stocks and its plants by the Government acting under various statutory war powers  and therefore that there was no reason to anticipate that the established maximum prices would actually impede the production of carcass beef and hence no case for relief under the applicable adjustment provisions. If such an argument were advanced, and accepted, the adjustment provision of Supplementary Order No. 9 on which Armour relied in entering into the contracts in question would seem to be somewhat of a snare and a delusion.
In view of the foregoing, we think that the orders denying the protests should be set aside and that the three proceedings should be remanded to the Administrator for further consideration by him directed more concretely to the narrow issue involved, namely, whether the maximum prices established by Maximum Price Regulation No. 169 impeded or threatened to impede the production of the commodities in question, and if so, what measure of relief is appropriate under the applicable adjustment provision. If, upon such further consideration, the Administrator should again enter orders denying the protests, in whole or in part, complainant, if it deems itself to be aggrieved thereby, will be entitled to file fresh complaints in this court under § 204(a) of the Act.
*242 The orders dated February 13, 1943, March 6, 1943 and March 8, 1943, denying the protests in Nos. 26, 27 and 28, respectively, are set aside, and the three cases are remanded to the Administrator for further proceedings in conformity with this opinion.
NOTES
[1] See In the Matter of Kaufman Beef Co. et al., Docket No. 1169-2-P, Consolidated, opinion by Price Administrator accompanying order denying protests of other parties against Maximum Price Regulation No. 169, O. P. A. Service 600:276.
[2] Supplementary Order No. 9 and Procedural Regulation No. 6 relate only to petitions for adjustment of maximum prices for commodities or services under government contracts. Most of the maximum price regulations contain adjustment provisions not so limited, as for instance § 1364.60 of Maximum Price Regulation No. 169 quoted supra in the text of this opinion. Procedural Regulation No. 1, issued originally on February 12, 1942, prescribes the procedure generally for applying for adjustment or exception pursuant to the provisions of the various maximum price regulations authorizing such action. Procedural Regulation No. 1 makes a clear distinction between a protest against the regulation itself and a petition for adjustment filed under an adjustment provision contained in the regulation. A petition for adjustment is not treated as a protest directed against the regulation; on the contrary, as in Procedural Regulation No. 6, it is provided that an order of the Administrator denying a petition for adjustment is subject to protest within sixty days after its issuance.
[3] The Administrator's economic argument on this point seems to assume that he will adhere to the policy of not establishing any maximum prices for livestock.
[4] Such revision was made, after Armour's application for adjustment was denied. See Revised Maximum Price Regulation No. 169, issued December 10, 1942. 7 F.R. 10,381. We are informed that there is now pending before the Administrator a protest filed by Armour against the revised regulation.