**ARMOUR & CO. v. BOWLES,**
Price Administrator.

No. 96.

United States Emergency Court of Appeals.

Heard at Chicago October 4, 1944.

Decided March 29, 1945.

---

Donald R. Richberg, of Chicago, Ill. (George E. Leonard, Jr., of Chicago, Ill., on the brief), for complainant.

Jacob D. Hyman, Chief, Court Review Price Branch, of Washington, D. C. (Richard H. Field, Gen. Counsel, Nathaniel L. Nathanson, Associate Gen. Counsel, Carl H. Fulda and John J. Downey, Jr., Attys., all of the Office of Price Administration, all of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and LAWS, Judges.

MAGRUDER, Judge.

This litigation was before us at earlier stages in Armour & Co. v. Brown, Em.App. 1943, 137 F.2d 233, and in Armour & Co. v. Bowles, Em.App., 1943, 139 F.2d 495.

On various dates between August 18, 1942, and May 11, 1943, Armour filed with the Price Administrator 46 applications for adjustments of its maximum prices for grades AA, A and B carcass beef, and grades A and B frozen boneless beef, as established in Maximum Price Regulation No. 169 (7 F.R. 4653) and in Revised Maximum Price Regulation No. 169 (7 F.R. 10381). The applications each related to particular sales of carcass beef or frozen boneless beef to the armed forces of the United States under government contracts, and were filed pursuant to the Administrator's Supplementary Order No. 9, issued July 14, 1942 (7 F.R. 5444), and to Procedural Regulation No. 6 (7 F.R. 5087, 5664).

Supplementary Order No. 9, so far as now material, provided:

"Any person who has entered into or proposes to enter into a contract with the United States or any agency thereof, * * * who believes that a maximum price established by any price regulation of the Office of Price Administration impedes or threatens to impede production of a commodity * * * which is essential to the war program and which is or will be the subject of such contract * * *, may file an application for adjustment of such maximum price in accordance with Procedural Regulation No. 6. Upon the filing of an application for adjustment and pending the issuance of an order granting or denying such application, contracts * * * may be entered into, or offered to be entered into, and deliveries may be made, at the price requested in such application. If, however, the order issued denies the application in whole or in part, the contract price shall be revised downward to the maximum price ordered, and if any payment has been made at the requested price, the applicant may be required to refund the excess."

The 46 applications for adjustment here involved were denied by the Administrator by orders Nos. 1, 8, 20, 22, 26, 29 and 34 under MPR 169 and RMPR 169, and each of these seven orders became the subject of a separate protest by Armour. By orders entered February 13, March 6, March 8, April 26, and June 23, 1943, the Administrator denied five of the protests, whereupon Armour filed five separate complaints in this court. Three of these complaints, against the orders of February 13, March 6, and March 8, respectively, were consolidated by this court (Docket Nos. 26, 27 and 28), and disposed of by us in Armour & Co. v. Brown, Em.App., 137 F.2d 233.

In support of its protests, as well as in support of its applications for adjustments, Armour had submitted to the Administrator cost figures compiled by its accounting department by the use of the so-called "cutout test" method, showing that, at prevailing cattle prices, if Armour should fill the pending government orders for carcass beef and frozen boneless beef at the applicable maximum prices it would realize substantially less per cwt. than its costs of production. The amount of the claimed losses varied somewhat with the individual contracts, but in most cases it was in excess of $2.00 per cwt.

At that time the Administrator did not challenge the reality of the indicated losses; indeed, he appeared to concede them. In his opinion denying the protests, the Administrator ruled that Armour was not entitled to adjustments of maximum prices

under Supplementary Order No. 9, despite a showing that under the existing ceilings it would be obliged to perform the government contracts at a loss. As the case was first presented to us, we did not think that the reasons advanced by the Administrator for denying the protests had any relevance to the issue of fact properly presented under the adjustment provision in question. Among such reasons was an assertion by the Administrator that Armour was making satisfactory profits on its business as a whole, despite the claimed losses on sales of carcass beef and frozen boneless beef to the armed forces at ceiling prices. As to this, we commented (137 F.2d 233, at page 240): "Nor can much significance be attached to the point that Armour may still be making a profit in the 'over-all operations' of its ramified business; this in itself, under normal circumstances, would hardly assure the continued production of an item that can only be sold at a loss." We concluded our opinion as follows:

"In view of the foregoing, we think that the orders denying the protests should be set aside and that the three proceedings should be remanded to the Administrator for further consideration by him directed more concretely to the narrow issue involved, namely, whether the maximum prices established by Maximum Price Regulation No. 169 impeded or threatened to impede the production of the commodities in question, and if so, what measure of relief is appropriate under the applicable adjustment provision. If, upon such further consideration, the Administrator should again enter orders denying the protests, in whole or in part, complainant, if it deems itself to be aggrieved thereby, will be entitled to file fresh complaints in this court under § 204(a) of the Act [50 U.S.C.A.Appendix § 924(a)].

"The orders dated February 13, 1943, March 6, 1943 and March 8, 1943, denying the protests in Nos. 26, 27 and 28, respectively, are set aside, and the three cases are remanded to the Administrator for further proceedings in conformity with this opinion."

Subsequently, on September 11, 1943, the Administrator issued an order vacating his orders of April 26 and June 23, 1943, denying two of the other protests. The complaints in this court against these two orders were then dismissed by agreement of the parties.

On September 22, 1943, the Administrator issued an order consolidating all seven of Armour's protests for further consideration in conformity with our mandate in Armour & Co. v. Brown, 137 F.2d 233, supra. At the same time he filed an intermediate opinion in which he developed the argument that Armour is engaged in an integrated multi-product business; that it derives from the slaughter of cattle not only dressed carcasses but also the raw material for hundreds of profitable by-products; that Armour's claimed "losses" on the sale of carcass beef have really been "bookkeeping losses" such as it has usually borne in the years prior to price control; that Armour, merely for the sake of eliminating such bookkeeping losses, would not be expected to discontinue the slaughter of cattle and thereby deprive itself not only of fresh beef but also of the numerous by-products, so long as its over-all profits on the related operations continue at a satisfactory level; that in the absence of adequate evidence showing the extent to which the slaughter of cattle contributed to the total profits, the only available test for determining whether Armour's production of beef had or had not been impeded was to see whether Armour's over-all profits from the business in all its wide ramifications compared favorably with normal peacetime earnings; and that, if such over-all profits were equal to or higher than Armour's average total profits realized during the period 1936-1939, Armour was not entitled to any adjustment of maximum prices for carcass beef or frozen boneless beef under the adjustment provision of Supplementary Order No. 9. The Administrator incorporated into the record certain data in substantiation of the foregoing argument, and granted Armour thirty days within which to introduce rebuttal evidence.

Armour filed with the Administrator a formal statement declining the opportunity to offer such rebuttal evidence, on the ground that the Administrator, in calling for evidence on the issue as above summarized, was not proceeding in conformity with the mandate of this court. Thereafter, on October 18, 1943, the Administrator issued an order denying all seven protests.

Armour then, on November 15, 1943 filed in this court a new complaint (No. 96) against the order of October 18, 1943,

denying the protests for the second time. (An amended complaint was filed March 1, 1944.) At the same time Armour filed in this court a motion asking us to issue an order in the nature of a writ of mandamus directing the Administrator to proceed in accordance with the mandate of this court and to grant forthwith the relief sought by complainant in its protest. In Armour & Co. v. Bowles, Em.App., 139 F.2d 495, 496, we denied this motion, pointing out that our earlier mandate had not directed the Administrator to grant the substantive relief demanded in the protests, but that the proceedings had been recommitted to him for further consideration in the light of the issue under the particular adjustment provision as we had formulated it. Further, we said: "At the present stage we are not called upon to decide whether the Administrator was justified in denying the protests. It is enough to say that under our mandate the argument which he advanced upon reconsideration of the protests was open to him to make. Its merits will be considered by us when Armour's new complaint comes before us for hearing." Since Armour's failure to offer rebuttal evidence before the Administrator was due to its misunderstanding of the effect of our previous opinion, we stated that we would regard such failure as excusable and would entertain an application by Armour, if it was so advised, for leave to introduce additional evidence under Rule 18.

On December 23, 1943, Armour filed such an application for leave to introduce additional evidence. By order entered January 4, 1944, we granted the application and ordered that the additional evidence be presented to the Price Administrator together with such other evidence as the Administrator might deem it proper to receive.

Pursuant thereto, the Administrator issued an order on February 23, 1944, reopening the protest proceedings and providing Armour with an opportunity to present its additional evidence, together with evidence on certain other matters desired by the Administrator.

The additional evidence was offered, and received by the Administrator, and after consideration he issued an order on June 3, 1944, again denying the protests. Thereafter the Administrator filed with this court the transcript of proceedings and his answer to the amended complaint.

In Armour & Co. v. Bowles, Em.App., 148 F.2d 529, decided by us this day, we upheld the general validity of RMPR 169 as against challenge by the same complainant. The present case involves quite a different issue. In Armour & Co. v. Brown, 137 F.2d 233, 240, we said, explaining the purpose of the adjustment provision in question:

"Supplementary Order No. 9 was designed to obviate delays in Government procurement of commodities essential to the war program. It was an invitation to sellers as to whom the established maximum prices were 'unreasonably low' to apply for adjustment upwards of the maximum prices of commodities to be sold to the Government, with permission to contract with the Government at such higher requested prices, subject to appropriate refund if the application for adjustment were subsequently denied by the Administrator. So far as government contracts are concerned, Supplementary Order No. 9 seems to make provision for relief of sellers who may have lost the right to challenge the validity of the regulation itself, or who may not be entitled to relief under the general adjustment provisions of the regulation, but whose continuing output is needed by the Government and is not likely to be forthcoming at prices which do not meet the costs of production."

The narrow issue of fact raised by Armour's applications for adjustment under Supplementary Order No. 9 is whether the maximum prices established by the regulation impeded or threatened to impede the applicant's production of the commodities in question, namely, carcass beef of grades AA, A and B, and frozen boneless beef of grades A and B, which were the subjects of the various government contracts involved in the 46 applications for adjustment. More precisely, the inquiry relates to the economic situation as it existed in a past period, namely, the 44-week period covered by the applications for adjustment. As appears from our opinion in Armour & Co. v. Bowles, Em. App., 148 F.2d 529, this was before the cattle stabilization plan of October 26, 1943, had been devised. During this period cattle prices were out of control and rising to unprecedented heights; slaughterers were getting "a miserable shellacking", according to the testimony of Mr. Gilbert, Economic Adviser to the Administrator, before the House Committee on Agriculture. It may

also be noted, not only that the inquiry relates to a past period, but also that the issue will not arise again under this regulation, for by Revised Supplementary Order No. 9, issued May 11, 1943 (8 F.R. 6175), the adjustment provision for government contracts, as provided in Supplementary Order No. 9, was specifically made inapplicable to RMPR 169.

Two points decided by us in Armour & Co. v. Bowles, No. 101, Armour & Co. v. Bowles, Em.App., 148 F.2d 529, have a bearing on the present case:

■ In No. 101 we upheld the Administrator's contention that the cut-out test method of cost accounting is not an acceptable criterion for determining whether RMPR No. 169 establishes generally fair and equitable maximum prices. For similar reasons we uphold the Administrator's contention in the case at bar that Armour's proof of cut-out losses does not in itself establish that the applicable ceiling prices impeded or threatened to impede the production of the commodities in question. At one point in its brief complainant concedes: "It is true that Armour and Company would buy beef cattle and slaughter them so long as the combination of beef products and by-products produced satisfactory profits." Yet such profits on cattle operations as an entirety may well coexist with "losses" on carcass beef computed by the cut-out test method.

■ On the other hand, in No. 101 we rejected the Administrator's alternative contention that the over-all profit position of the industry under price control, as compared with a representative peacetime period, is the only appropriate standard for determining whether the maximum prices prescribed in RMPR 169 are generally fair and equitable. For similar reasons we reject the Administrator's contention in the case at bar that Armour has failed to make out a case for adjustment under Supplementary Order No. 9, since its over-all profits under price control, which include a large amount of profits in no way derived from the domestic slaughter of cattle, have been at higher levels than its over-all profits realized during the period 1936–1939. In effect, the Administrator's position is based upon an assumption that, apart from reference to the total over-all returns of its ramified business, there is no acceptable accounting method by which a reasonable packer in Armour's position can determine whether it is profitable or otherwise to continue the production of carcass beef and frozen ‧ boneless beef of the grades called for by the government's contracts in question. It seems to us that this is a wholly unreasonable assumption. In applying the adjustment provision in question, the Administrator cannot throw up his hands and say that the only acceptable criterion is over-all profits merely because the alternative may involve the consideration of debatable items of cost allocation, cost accounting not being an exact science.

■ It is conceded by the Administrator to be a reasonable assumption that under normal circumstances "an applicant who petitioned for adjustment of maximum prices on the ground that such prices did not cover the cost of producing a particular commodity for the war program could not be reasonably expected to continue production and sale of that commodity if the existing maximum price failed to cover actual production costs no matter what over-all return the particular seller might realize from his business as a whole." In applying Supplementary Order No. 9 to multi-product industries generally, the Administrator customarily uses standards similar to those approved by us in Gillespie-Rogers-Pyatt Co., Inc., et al. v. Bowles, Em. App., 1944, 144 F.2d 361. That is, if the applicant's current over-all profits are appreciably higher than his over-all profits during a representative peacetime period, the maximum price for the particular commodity involved in the application under Supplementary Order No. 9 will be adjusted only if, and to the extent, necessary to cover the manufacturing costs of that commodity (i.e., all costs except selling and administrative).[1] We think that this standard usually applied by the Administrator under Supplementary Order No. 9 is a proper one. As stated by the Administrator in his brief: "Because of the inter-relationship of many elements of indirect manufacturing costs in a multi-

[1] The standard for individual adjustment under Supplementary Order No. 9 allows the recovery of total manufacturing costs, whereas the product standard approved by us in the Gillespie case allows merely out-of-pocket costs where the validity of the Regulation is involved.

ple product industry, a product which returns manufacturing costs shares this overhead burden and thereby contributes to the higher level of profits derived from the total operations of the enterprise. This standard does not, of course, provide an incentive for concentrating production on the essential commodities. That was not the purpose of the adjustment clause." No doubt the application of this general formula in any case may involve difficult questions of cost accounting, just as it may in the case at bar. But we think that Armour makes out a case for adjustment under Supplementary Order No. 9 if its total realization from the cattle operations involved in the filling of the contracts for the armed forces was not sufficient to recover the manufacturing costs, due account being taken of the profits attributable to the processing of the by-products.

In Exhibit I, Armour has submitted figures, which it also introduced in No. 101, allocating and crediting to the beef division its equitable share of all profits made by any other department out of by-products of beef, in order to show the total results of its entire cattle operations for its fiscal years 1941, 1942 and 1943. The figures are summarized in our opinion in No. 101. The amount of the profits of the processing departments allocated back to the primary beef slaughtering division was arrived at on the basis of the ratio that the value of the raw materials received from the beef division bore to the value of the total raw materials processed in each processing department. This formula seems to us a reasonable one for the purpose at hand. The Administrator is critical of it; but his alternative suggestion that all the profits of the processing department should be allocated back to the beef division when any by-product of cattle slaughter entered into the processing operations certainly is unacceptable.[2]

Armour's Exhibit IV more directly bears on the issue in the present case. In this exhibit, which covers the 44-week period in question, Armour has segregated its processing results and costs of beef sold to the government, grades AA, A and B, from all other beef sales, still using the allocation formula which it used in Exhibit I. From Exhibit IV it appears that Armour sold 139,873,000 lbs. of beef to the government in the 44-week period; in addition, it sold to others or transferred to its processing departments 986,935,000 lbs. of beef. This latter figure is composed of 241,884,000 lbs. derived from canners and cutters and bologna bulls, and 745,051,-000 lbs. of "shipper grade" grades of beef, that is, grades AA, A, B and C. The total cut-out loss on all this beef sold to the government and others during the period was $10,794,000. Apportionment of this total cut-out loss between beef sold to the government and all other beef indicates a cut-out loss on government beef of $2,907,000, or $2.079 per cwt., and for beef sold to others $7,887,000, or $0.799 per cwt. This last figure represents the combined total of both the processing grades and the shipper grades of non-government beef. Armour did not break this figure down so that the cut-out results on canners and cutters and bologna bulls and on the shipper grades could be observed separately.

Exhibit IV then gives the processing profits to be allocated back to the primary beef slaughtering division, thus reducing the cut-out losses stated above. To government beef it has allocated $623,000, or $0.446 per cwt. in processing profits, thereby showing, after allocation, a loss of $2,284,000, or $1.63 per cwt., on government beef. To all non-government beef (including all grades), a processing profit of $7,606,000 is allocated, or $0.771 per cwt., leaving a net loss after allocation of $281,000, or $0.028 per cwt.

Although the cut-out losses on non-government cutters and canners and shipper grades are not given separately, the processing profits allocated to those grades are stated separately. A processing profit of $4,229,000, or $1.749 per cwt., is allocated to cutters and canners and bologna bulls, and a processing profit of $3,377,000, or $0.454 per cwt., is allocated to the shipper grades. The much higher process-

2 In this connection complainant states in its brief: "Where beef and pork both go into the making of a processed product, such as sausage, the Administrator argues, in his latest opinion, against allocating to the Beef Division profits proportionate to the amount and value of the beef in that product, and asserts, with an amazing lack of logic, that the entire profits should be allocated to beef. Just what would the Administrator do when the price of pork is under consideration? He will have no profits left from pork to be allocated to pork."

552

ing profit from the slaughter of cutters and canners and bologna bulls results from the fact that on these grades the carcass meat itself is used for processing in addition to the ordinary raw by-products.

It appears, then, that for the 44-week period in question, Armour's losses in cattle operations on account of its government contracts far exceeded its indicated losses on civilian business. There are several explanations for this result. In the first place, greater processing profits are derived from the less costly cutters and canners and bologna bulls, whereas the production of carcass beef and frozen boneless beef for the armed forces requires the slaughter of cattle producing carcasses of grades AA, A and B. In the second place, the sales of carcass beef to the armed forces were in carload lots, which in the period in question were subject to a discount of $0.75 per cwt. This discount was evidently greater than the saving resulting from unit sales in carload lots, because, by Amendment No. 21 issued July 16, 1943 (8 F.R. 9995), the Administrator reduced this discount to $0.25 per cwt., explaining that "sellers avoided carload sales to war procurement agencies because they could dispose of their product in lesser quantities in the civilian market." Previously, he had found it necessary to suspend altogether the carload discount on sales of carcass beef and frozen boneless beef to war procurement agencies during the period from April 23 to June 13, 1943. (See Amendment No. 8, 8 F.R. 5478; Amendment No. 9, 8 F.R. 5634; Amendment No. 10, 8 F.R. 6058; Amendment No. 14, 8 F.R. 7199, and Amendment No. 16, 8 F.R. 8011.) A third factor contributing to the greater realization on civilian sales was the profit which might at that period be derived from fabricating cuts for sale to purveyors of meals;[3] also the profit from grinding into hamburger, curing and drying.

It seems clear that the established maximum prices during the period now in question constituted a substantial impediment to the slaughtering of animals yielding carcasses of the grades required by the government contracts. With results so unfavorable in the better grades, the natural consequence was a greater concentration on the slaughter of the lower and less expensive grades yielding the type of meat found in sausage, hamburger, canned meats and other processed products.

When it comes to computing the amount of the adjustment, we recognize that all will not be clear sailing.

Armour has claimed that the adjustment should be sufficient to enable it to recover its costs computed by the cut-out test method, plus a profit of 2%. For the reasons above indicated, this yardstick cannot be accepted.

We have held above that there are no peculiar features in the meat industry warranting the use of an over-all profits test as the exclusive criterion for determining adjustments under Supplementary Order No. 9, in place of the usual standards applied by the Administrator in the case of multi-product industries. Under the standards ordinarily applied by the Administrator in such cases, since Armour's over-all profits are above the levels of 1936-1939, the adjustment need only be sufficient to allow a recovery of manufacturing costs on the products in question (i.e., all costs except administrative and selling). In this connection we are not concerned with Armour's entire cattle operations but only with those commodities, covered by the government contracts in question, whose production was impeded by the existing maximum prices. As shown by the figures quoted above from Exhibit IV, Armour's loss, after allocation of processing profits, on 139,000,000 lbs. of carcass beef and frozen boneless beef sold to the government, was $2,284,000. Its loss on civilian sales of 986,000,000 lbs. of all grades of beef, after allocation, was $281,000. The administrative and selling expenses attributable to the beef division have not been apportioned for the 44-week period; but on the basis of Armour's figures for the fiscal years 1942 and 1943, the administrative and selling expenses attributable to the beef division for the 44-week period would appear to be about $8,228,000. If this lump sum of $8,228,000 is apportioned between the government and non-government sales on the base of the tonnage involved, the indication is that the losses sustained on the beef sold to the armed forces are considerably larger than the attributable administrative and selling expenses, which are about $1,100,000.

The inference to be drawn is, therefore, that some adjustment is due to complainant. The amount can at best be only roughly determined, and will never be arrived at if

[3] See Oswald & Hess Co. v. Bowles, Em.App., 148 F.2d 543.

every hypothetical inexactitude in the details of accounting procedure is overemphasized.

A judgment will be entered setting aside the order of June 3, 1944 denying the protests and remanding the case to the Administrator for further proceedings in conformity with this opinion.