## AMERICAN BRAKE SHOE CO. v. BOWLES, Price Administrator (two cases).

### Nos. 141, 204.

United States Emergency Court of Appeals.

Heard at New York May 21, 1945.

Decided Sept. 28, 1945.

William Dean Embree, of New York City (Robert L. Lingelbach, of New York City, on the brief), for complainant.

Nathaniel L. Nathanson, Associate Gen. Counsel, Office of Price Administration, of Washington, D. C. (Richard H. Field, Gen. Counsel, Jacob D. Hyman, Chief, Court Review Price Branch, Louis L. Rochmes, Atty., and Joseph Brenner, Atty., all of the Office of Price Administration, all of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and McALLISTER, Judges.

MAGRUDER, Judge.

The protests in these two cases were directed against orders of the Price Administrator denying applications by American Brake Shoe Company for individual adjustments of the maximum prices on brake shoes.

Complainant is a multi-product manufacturer selling brake shoes, steel forgings, manganese steel and alloy castings, automotive friction brake materials, and many other related products. Complainant's brake shoe division manufactures about 75 per cent of all the brake shoes produced in this country.

Maximum Price Regulation No. 136, as Amended—Machines and Parts, and Machinery Services, issued June 30, 1942 (7 F.R. 5047), established as complainant's maximum prices for brake shoes the prices it had in effect on October 1, 1941. The adjustment provision here involved, § 1390.-

25a, was added to the regulation by Amendment 78, issued April 6, 1943 (8 F.R. 4516), and further amended by Amendment 92, issued June 19, 1943 (8 F.R. 8544). It reads in part as follows:

"(a) Application by a seller—(1) Who may receive an adjustment. The maximum price established by this regulation for a machine or part may be adjusted in the case of an essential supplier of an essential machine or part. An 'essential machine or part' is one which contributes to the effective prosecution of the war. An 'essential supplier' is one whose output or supply of a machine or part cannot be reasonably expected to be replaced at prices lower than the proposed adjusted maximum price. In addition, any person who has entered into, or proposes to enter into, a war contract (as defined in subparagraph (5)), or a subcontract thereunder, is an essential supplier of an essential machine or part.

"(2) When adjustment may be granted— (i) In general. The Office of Price Administration, any regional office, or such other offices as may be authorized by order issued by the appropriate regional office, may adjust the maximum price in the case of an essential supplier of an essential machine or part upon the basis of information submitted by the supplier or of other information. It may make that adjustment whenever it finds that the maximum price of a machine or part is at such a level that (taking into account the cost thereof, the profits position of the supplier and the nature of his business) production or supply of the machine or part is impeded or threatened and that the adjustment would not cause an increase in the cost of living."

The adjustment provision also states certain factors which are considered relevant in determining whether the production or supply of the machine or part is impeded or threatened. The factors are quoted in the footnote.[1]

Complainant's first application for adjustment was filed June 16, 1943. It asked for an increase of $3.00 per ton in its average maximum prices for brake shoes. The application was denied by order of the Administrator issued August 26, 1943. In a protest against this order, filed October 23, 1943, complainant alleged that it was an essential supplier of an essential machine or part; that its production of brake shoes was impeded or threatened by the applicable maximum prices, and that the requested adjustment would not cause an increase in the cost of living. The protest was denied by order of the Administrator issued April 1, 1944. In an opinion accompanying the order of denial, the Administrator concluded that the applicant had failed to establish that the existing maximum prices impeded or threatened its production of brake shoes. The Administrator concedes that brake shoes are essential within the meaning of the adjustment provision, that complainant is an essential producer thereof, and that an adjustment would not increase the cost of living.

Following denial of the foregoing protest, American Brake Shoe Company filed its complaint in this court (Case No. 141). Later the protest proceeding was reopened by the Administrator, upon order of this court, for the presentation of additional evidence. By order issued August 29, 1944, the Administrator again denied the protest upon reconsideration.

Complainant's second application for adjustment under § 1390.25a was filed August 15, 1944. It asked for increases of $10.00 per net ton in the maximum prices of each

[1] § 1390.25a Adjustments * * *
"(ii) Factors which may be considered. (a) The following factors are relevant to the consideration of whether production or supply of the machine or part is impeded or threatened:
"(1) Whether, and by what amount, the maximum price is below or above (i) the total unit costs less selling and administrative expenses properly allocable to the internal management of the business in the case of a manufacturer and (ii) the current price being charged the seller in the case of any other seller.
"(2) Whether, and by what amount, the maximum price is above total unit costs.
"(3) Whether, and by what amount, the supplier's current over-all profits before income and excess profits taxes are greater or less than his average over-all profits during the normal base period, increased by 7% of the additional capital investment contributed entirely by the supplier, or its stockholders, since the normal base period.
"(4) Whether the proposed price is higher than the price prevailing in the industry.
"(5) Whether the supplier's sales of the machine or part represent only a very small part of his total sales.
"(6) Whether the supplier previously sold the machine or part at a price which was below its total unit costs."

type of brake shoe manufactured and sold by it. This application was denied by order issued October 9, 1944. On November 17, 1944, complainant filed its protest against this order. On February 12, 1945, the Administrator issued an order denying the protest, following which complainant filed a complaint in this court (Case No. 204).

The application for adjustment involved in No. 204 was supplementary to, and in effect superseded, the earlier application involved in No. 141. By order of this court the two complaints were consolidated for hearing and disposition. It will be unnecessary hereinafter to differentiate between the two cases.

■ Since the protests here were merely against orders denying individual applications for adjustment, this court is not now required to consider whether the maximum prices established by MPR 136, as amended, are "generally fair and equitable". No issue is presented as to the validity of the regulation under the terms of which the individual adjustments were sought. The only question is whether, on the evidence, the Administrator was arbitrary or capricious in concluding that complainant had failed to bring itself within the terms of § 1390.25a, as being entitled thereunder to an upward adjustment of maximum prices. See Capitol Foundry Co. v. Bowles, Em.App., 1944, 146 F.2d 855, 857.

■ In the interest of uniformity of administration of the adjustment provision, the Administrator has adopted an objective standard for determining when maximum prices may be deemed to constitute an impediment or threat to the applicant's production of a commodity, within the meaning of § 1390.25a. As we said in Capitol Foundry Co. v. Bowles, supra, 146 F.2d at page 857: "The adoption of standards by the Administrator for the sake of uniformity in making necessary adjustments in maximum prices is not only permissible but highly desirable." In his opinion accompanying the order denying the protest in No. 204, the Administrator sets forth the standard by which he has been guided in disposing of applications for adjustment under § 1390.25a. He states that:

" * * * there is deemed to be no threat to production by a manufacturer who currently earns double his base period earnings before income and excess profits taxes, and whose maximum price returns to him total unit factory costs. These include all costs attributable to the particular product except selling and general administrative expense. In the Administrator's opinion, a manufacturer so favorably situated can readily absorb the selling and administrative expense attributed to a particular product. In the case of manufacturers whose current over-all profits arc in excess of but less than double their average base period profits, adjustments have been granted increasing particular maximum prices to the point where they will return total unit costs. These standards assure not only that essential manufacturers of essential machinery will not sustain out of pocket losses, but that their maximum prices will contribute a share of the joint costs of their entire operations. How large a share they should be required to contribute is, in the Administrator's opinion, dependent on the individual's relative over-all financial picture."

The relevant factors set forth in the adjustment provision itself[2] dovetail with the standard thus formulated by the Administrator, putting an applicant upon notice that, to make out a case for an adjustment, he will have to supply the Administrator with information as to his base period over-all profits and his current over-all profits; also as to whether and to what extent the applicable maximum price for the commodity in question is below or above the total unit cost.

■ We think that the standard applied by the Administrator is a reasonable one; it is, indeed, somewhat more liberal to the applicant than the standard for adjustment which we approved in Armour & Co. v. Bowles, Em.App.1945, 148 F.2d 546, 550.

It is quite clear from the evidence in the transcript that complainant has failed to establish a case for adjustment under the terms of the adjustment provision and the standard which the Administrator has adopted in administering it.

Complainant's evidence gives a picture of continually rising costs in its brake shoe division, decreasing unit profits on brake shoes, and decreasing brake shoe division profits. The financial information has been conveniently summarized in tables presented by the complainant to the court at

---

[2] Footnote 1, supra.

the oral argument. These are reproduced here with certain figures added:

### Brake Shoe Division Financial Data

| Period | Tons of Brake Shoes Shipped | Brake Shoe Net Profits Before Taxes | Net Profits Per Net Ton | % of Profit on Gross Sales |
|---|---|---|---|---|
| Base Period Average (1936–39) | | | | |
| Per Year | 126,274 | $1,222,892 | $9.68 | 19% |
| Year 1940 | 139,140 | 1,251,004 | 8.99 | 16.5 |
| " 1941 | 169,021 | 1,536,421 | 9.09 | 15.5 |
| " 1942 | 170,574 | 1,013,336 | 5.94 | 9.9 |
| " 1943 | 206,846 | 865,306 | 4.19 | 7.0 |
| First 11 months of year 1944—projected to a full year basis | 218,360 | 340,964 | 1.56 | 2.6 |

### Complainant's Overall Financial Data

| Period | Overall Net Profits Before Taxes | Net Worth For Period | % of Net Profits on Average Net Worth for Period |
|---|---|---|---|
| Base Period Average | | | |
| Per Year | $2,712,750 | $28,485,250 | 9½% |
| Year 1942 | 9,391,458 | | |
| " 1943 | 8,151,658 | 39,831,488 | 20½% |
| First 11 months of year 1944—projected to a full year basis | 5,205,494 | 41,157,468 | 12.6% |

■ Since complainant is earning over-all profits greater than but not double its over-all profits in the base period,[3] it is not entitled to an adjustment under § 1390.25a, pursuant to the standard which the Administrator has adopted, because it has continued to recover its total unit costs on brake shoes, and indeed to earn a margin of profit on each ton of the commodity sold, although this margin has been progressively decreasing.

■ These figures are from complainant's own books. But complainant asserts that its unit profits, as above set forth, have been overstated in recent years by reason of the fact that the amount of depreciation as charged on its books is based upon normal peacetime operations when the plants were working about 36 hours per week, whereas, in response to wartime demands, production has been greatly increased and the work week lengthened, enhancing the wear and tear on machinery and equipment. However, complainant has submitted no satisfactory evidence as to the extent to which an adjustment should be made for this claimed accelerated depreciation. All that was offered in this connection was a statement by complainant's president in a letter to the Office of Price Administration: "* * * I don't know what a fair estimate for actual depreciation is under these circumstances, but feel that double the present figure of $1.92 would still be an underestimate of the increased tonnage effect." Under these circumstances the Administrator was justified in following his usual practice of accepting "as an item of cost the normal depreciation and obsolescence charges carried on a firm's books, and found acceptable to the Bureau of Internal Revenue for income-tax purposes." As the Administrator rightly observes, if the claim of abnormal depreciation were well-founded, complainant might reasonably have been expected to have established "on its books a new rate of depreciation, subject to eventual approval by the Bureau of

---

[3] Also, although there has been a considerable addition to the net worth of the company, consisting mostly in a large increase in plant and equipment, the ratio of profits to net worth under price control exceeds that of the base period.

Internal Revenue, and thereby provided a useful guide by which the Administrator could make a finding, in the light of the changed facts, as to the relationship between Complainant's unit costs and its maximum prices."

It is also claimed that the unit profits as shown by the company's books are misleading in that sufficient allowance has not been made for accelerated amortization of new facilities and equipment which, complainant anticipates, will burden it with excess capacity when the war demand for brake shoes slackens. As explained by complainant's president, in a letter to the Office of Price Administration dated September 21, 1943:

"As early as 1939 the company foresaw the demands which would be made upon it as a result of wartime conditions and set out upon a program of expansion and mechanization to increase plant capacity which has already cost $2,750,000, an increase of more than 100% of the value at which our plant was formerly carried. Of this sum only $500,000 is subject to five year amortization certificates, the balance to only normal rates of depreciation. With the depreciation rates which are now being applied, we have estimated that by December 31, 1944 (prior to which time we believe the demand for our present capacity will be drastically reduced), $825,-000 of these costs will have been absorbed, leaving $1,925,000 unabsorbed—largely excess capacity. If we had spread the unabsorbed balance over the period of time for which the increased capacity is required, the cost per ton of brake shoes produced in that time would more than wipe out our present nominal profit."

The complainant is here referring to a conjectural future loss which may never materialize, not to an item properly to be considered as a present cost of production. Furthermore, only to the extent of $500,000 has its new investment been certified as representing an "emergency facility" under Internal Revenue Code § 124, 26 U.S.C.A.Int.Rev.Code, § 124, entitling complainant to an accelerated amortization at the rate of 20 per cent a year. As the Administrator pointed out in his opinion in No. 141, to the extent that the cost data submitted by complainant included an allowance for five-year amortization of part of its new investment, "the current profits on brake shoes are understated."

After the oral argument, complainant presented certain additional evidence to the Administrator, pursuant to our leave. This consisted of an affidavit by an official of the brake shoe division of the company stating as follows:

"In June, 1944, it became necessary for the Brake Shoe Division to commence to ration the supply of finished Brake Shoes being delivered by the Division to its customers. This rationing became necessary because of the mounting needs of the railroads and because production was not at a rate sufficient to supply those needs. The rationing has no direct relationship to orders placed by individual customers, but has been based primarily on the Brake Shoe Division's estimate of the needs of each of its customers. At present the rationing is on a basis of approximately eighty-seven (87) per cent of our estimates of such needs. There is at present no indication of any easing of the situation."

Upon consideration of this affidavit, the Administrator, on June 23, 1945, issued an order denying the protests upon reconsideration. We agree with the Administrator that this additional evidence lends no material support to the complainant's case. As stated in the Administrator's supplemental opinion, "the fact that demand exceeds supply is not, in and of itself, evidence that price restrictions stand in the way of adequate supply. Excess of demand over supply is the outstanding fact in the American wartime economy." Furthermore, it is not the purpose of the particular adjustment provision in question to provide a price incentive for further expansion of an applicant's productive facilities to rectify a current excess of demand over supply. See Armour & Co. v. Bowles, Em. App.1945, 148 F.2d 546, 550–51.

Complainant urges that there is an inconsistency between the action of the Administrator in denying these applications for an adjustment of the price of brake shoes, and his action in increasing the maximum price on another product manufactured by complainant, manganese steel castings, by Amendment No. 1 to MPR 235 (10 F.R. 1609). The latter was an industry-wide adjustment designed to assure the continued validity of the regulation itself. The manganese steel casting industry, treated by the Administrator as a single-product industry, was given an increase in maximum prices to enable said

industry as a whole to realize earnings equal to the industry's base period profits. Complainant's manganese steel castings division, as a member of that industry, received the benefit of the industry-wide increase. Complainant probably would not have been entitled to an individual price adjustment for its manganese steel castings under the terms of the adjustment provision now in issue.

Other subsidiary arguments in complainant's brief likewise confuse the question whether the maximum prices established in the regulation are "generally fair and equitable" with the question whether a particular applicant is entitled to an individual adjustment of a maximum price on the ground that such price constitutes an impediment or threat to the applicant's production of the commodity.

The denial by the Administrator of these applications for adjustment does not foreclose the filing of a new application in the future if the unfavorable trend in complainant's brake shoe division continues to a point where the requirements of the adjustment provision are satisfied. Under the regulation, an applicant for adjustment is protected from interim loss pending action on his application, by virtue of a provision allowing him to sell his product at a price to be adjusted upward to correspond with such increase in the maximum price as is finally allowed by the Administrator in disposing of the application.

Judgments will be entered dismissing the complaints.