## NEW ORLEANS LAUNDRIES, Inc., v. PORTER, Price Adm'r.
### No. 294.

United States Emergency Court of Appeals.

Heard at Washington June 1, 1946.
Decided Nov. 18, 1946.

James R. Sharp, of Washington, D. C. (Jacob L. Holtzmann, of New York City, and Lucien H. Mercier, of Washington, D. C., on the brief), for complainant.

Seymour Friedman, of Washington, D. C., Sp. Asst to the Assoc. Gen. Counsel (Richard H. Field, of Washington, D. C., Gen. Counsel, Jacob D. Hyman, of Buffalo, N. Y., Assoc. Gen. Counsel, and Joseph Brenner, of Washington, D. C., Atty., all of the OPA, on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and LAWS, Judges.

MAGRUDER, Judge.

This case draws in question the validity of an individual adjustment order issued by the Price Administrator under § 16(a) of Revised Maximum Price Regulation 165 (10 F.R. 2097) regulating the charges for various miscellaneous services. Particularly at issue is the propriety of certain criteria or standards formulated by the Administrator as administrative guides in processing the applications for adjustment.

Complainant is a Delaware corporation, with principal offices in New Orleans, Louisiana, organized in 1942 by a bondholders' protective committee to acquire the assets of the defunct Crescent City Laundries, Inc. It operates ten separate plants in the greater New Orleans area, seven being combination laundry and dry cleaning establishments, one a dry cleaning plant exclusively, one a rug cleaning plant, and one a storage plant. In addition, it operates a central garage for motorized equipment and a central office for accounting, purchasing of supplies and equipment, sales promotion, and supervision and coordination of the company's operations. Its sales volume has been in the neighborhood of $3,000,000 annually, representing about two thirds of all power laundry service performed in the New Orleans area, including all the local work of the Pullman Company, the Maritime Commission, and most of the Army contract laundry service.

Under RMPR 165, complainant's maximum prices are established at the highest prices charged in March, 1942. In this proceeding no challenge is made to any provision of the regulation itself, which must be assumed to be in all respects generally fair and equitable.

Section 16(a) of the regulation makes provision for upward adjustment of individual maximum prices upon a demon-

stration of substantial financial hardship threatening the applicant's ability to continue supplying a service, subject to certain conditions. The section reads as follows:

"Sec. 16. Adjustments—(a) General adjustments. OPA may adjust any maximum price established under this regulation upon a demonstration of substantial financial hardship threatening your ability to continue to supply a service, subject to the following limitations:

"(1) No adjustment will increase your maximum prices above the levels necessary to permit you to continue the sale of your services;

"(2) No adjustment will be made if it will create or tend to create a need for increases in the prices of other sellers in your locality or elsewhere; and

"(3) No adjustment will increase your maximum prices above the prices at which your customers are able to obtain the same or a fairly equivalent service from other suppliers.

"However, if, in the judgment of OPA, the loss of your services would be detrimental to the effective prosecution of the war or would impair the maintenance of an adequate wartime standard of living, OPA may apply only the first and second of the above limitations.

"In judging whether a maximum price subjects you to substantial financial hardship, OPA will take into account such pertinent factors as the nature of your business, its earnings, and the earnings of your trade as a whole during a representative pre-war period. A price increase may be denied in whole or in part, however, if your hardship is attributable to such causes as a decline in sales volume because of reduced demand, general manpower shortage, shortage of essential supplies, or other difficulties apart from your maximum price. Even though a particular service or type of service is not profitable, an adjustment may be denied in whole or in part if, in the judgment of OPA, such action is justified in view of the profitability of your business as a whole."

Since RMPR 165 applies to a multitude of services, the Administrator has deemed it appropriate to develop various administrative criteria for certain specialized types of service in order that the adjustment provision of § 16(a) might be uniformly administered with due regard to the peculiarities of the particular service under consideration. In this case the Administrator has incorporated into the record an extract from § 5 of the OPA Manual setting forth the criteria for measuring the financial hardship of a seller of laundry services and governing the upper limit to which a seller's prices may be adjusted pursuant to application under § 16(a). The quoted portion of subparagraph B of § 5-1531.03 of the OPA Manual is as follows:

"B. Specific policy on adjustments.

"1. General rule.

"a. Basic limitations. An adjustment of maximum prices will be made to provide:

"(1) Management returns of four percent to concerns whose management returns in 1941 were four percent of sales or less and concerns which were not in business in 1941.

"(2) Management returns equal to their 1941 returns to concerns whose management returns in 1941 were more than 4 percent of sales and not more than eight percent.

"(3) Management returns of eight percent to concerns whose management returns in 1941 were more than eight percent.

"b. Definition of sales. The term 'sales,' as used in these instructions, is the actual total amount paid for services by the customers of the applicant. Overcharges, if any, are to be deducted. Where discounts are granted to large customers on a volume basis, only the actual payments made by such customers are to be counted. Total sales include income from sales whether the actual processing is done by the applicant or by another firm.

"c. Definition of management returns. Management returns consist of net operating profit, interest, executive salaries, income and excess profit taxes whether state or federal.

"d. Definition of executive salaries. The following payments and withdrawals are to be treated as executive salaries:

"(1) All payments to and withdrawals by a sole owner, and all payments to and withdrawals by one (presumably the general manager) of two or more owners, partners or officers. Such payments and withdrawals are to be so treated even though all or part is charged by the applicant to 'plant supervision,' 'route supervision,' or some other expense account, and regardless of the actual work performed by the owner or officer concerned.

"(2) All payments to and withdrawals by absentee partners, and all payments to and withdrawals by a single active partner owning a business in conjunction with one or more absentee partners.

"(3) All payments to and withdrawals by a general manager, or to any of the following when performing the duties of a general manager: A trust or corporation officer or officers, two or more partners, an executive agency, a management company.

"(4) Wages or salaries paid to owners and partners, other than those specified in clauses (1), (2), and (3) immediately above, and to stockholders and relatives of owners in excess of the going rate of wage or salary for the work done by them. In such cases an amount equal to the going rate is to be treated as expense. When a supervisory job is held by a bona fide employee and no attempt is being made to disburse profits to him in the form of wages or salary, his entire salary is to be treated as expense.

"(5) 'Going rate of wage or salary' is the wage or salary customarily paid to an employee in an establishment of the same kind and similar size in the same market area during the period under consideration."

The substance of the foregoing specific criteria was put by the Administrator in question and answer form in a "Revised Guide to OPA Price Regulations and Price Adjustments for Power Laundries, Dry Cleaners and Litten Supply Concerns". This Revised Guide was supplied to the trade and published by the American Institute of Laundering for issuance to its members. Following are relevant extracts from the Revised Guide:

"7. Q.—When is a laundry or dry cleaner in hardship?

"A.—It depends on the amount of management return earned by the applicant in 1941. Management return is the difference between total income (from sales) and expense, not including executive salaries and interest in expense. Non-operating receipts and expenditures are not included in the calculation. Maximum prices may be adjusted to yield a return equal to that earned in 1941, provided it is not more than 8%, and to yield at least 4% in any case."

"24. Q.—What payments and withdrawals are considered to be executive salaries?

"A.—(1) All withdrawals by a single owner, even though he personally fills many supervisory jobs, and all withdrawals by some one (presumably the manager) of two or more owners, partners, or officers.

"(2) All withdrawals by absentee partners.

"(3) All withdrawals by a general manager.

"(4) A portion of salaries paid to other partners, stockholders, or relatives of owners, in excess of the going rate. ('Going rate' is the amount customarily paid for similar work in laundries of equivalent size in the same area at the same time.) But when owners, partners, etc., hold supervisory jobs, the going rates for such jobs are considered expense. When a supervisory job is held by any one else who is a bona fide employee, his entire salary is expense, although it exceeds the 'going rate'."

"25. Q.—Is it any of OPA's business if a concern buries profits in expense accounts?

"A.—OPA does not concern itself with your methods of accounting, but if it is to treat all applicants fairly it must separate expenses and profits in all applications."

On October 23, 1943, complainant filed with the Dallas regional office an application under the provisions of MPR 165, as amended, for adjustment of maximum prices based upon an increase of wages to employees. By order issued January 10, 1944, the Regional Administrator granted com-

plainant an increase of 21% over March, 1942, prices.

This price adjustment was later reëxamined by the Regional Administrator; and on February 17, 1945, that official issued an order reducing the increase which had been theretofore granted from 21% to 7% over March, 1942, prices. This order of February 17, 1945, contained the following recitals:

"The Price Administrator has determined that an adjustment which provides management returns of 4% of sales is sufficient for a supplier such as you who was not in business in the year 1941 to permit the continuance of services which you supply and to alleviate substantial hardship.

"An analysis of the accounting study made at your business reveals that an adjustment of your unadjusted legal prices by an amount not to exceed 7% should permit you to pay the authorized or approved War Labor Board wage increases and to realize a management return of 4% of your sales.

\* \* \* \* \*

"The Price Administrator in making his determination that a management return of 4% of sales is sufficient to relieve substantial hardship and permit the continued supply of these services has determined that salaries or withdrawals by stockholders or officers of your company as well as your nine plant managers should be considered as returns to your business."

Complainant promptly filed with the Administrator an application for review of the Regional Administrator's order of February 17, 1945. Upon such review, the Administrator determined that the salaries of the nine plant managers should have been allowed as operating expense, and, accordingly, by order issued April 27, 1945, he modified the adjustment order under review so as to provide for an increase of 8.5% over March, 1942, prices. In order to afford complainant the necessary time to prepare to roll back its prices, the order permitted the 21% increase previously granted to remain in effect until May 11, 1945. In the Administrator's order of April 27, 1945, it was explained that, under the OPA's adjustment standards, "a laundry firm not in operation in 1941, the year we customarily use as a base period for laundry adjustment purposes, is considered in hardship if its prices are not currently providing management returns of at least four per cent of sales. Management returns consist of executive salaries and net operating profit or loss before interest"; further, that these adjustment standards are based on management returns as defined, "in order that we may treat without discrimination firms which distribute all or a portion of their returns as executive salaries and those which distribute their returns in the form of profit."

On May 22, 1945, complainant filed its protest against the Administrator's order of April 27, 1945, fixing its upward adjustment at 8.5% as against the 21% originally granted. The protest objected that the Administrator had discriminated against the complainant in the administration of the adjustment provision in that the order in this case failed to follow the OPA's announced criteria for adjustment as contained in the Revised Guide; that the criteria applied by the Administrator in this case "determined Protestant's costs by a method contrary to established accounting methods and the traditional cost accounting method of Protestant and Protestant's industry generally, and in a manner violative of the Emergency Price Control Act of 1942, as amended [50 U.S. C.A.Appendix, § 901 et seq.]"; that the criteria here applied by the Administrator "are inequitable and unfair to the Protestant and will require the operation of Protestant's business without any general supervision in that the Administrator refuses to allow as an expense of said business the normal and traditional amount of supervisory personnel required for the operation of Protestant's business." As a separate point, the protest objected that the criteria applied by the Administrator "are inequitable and unfair to the Protestant in that the Administrator refuses to allow as an expense of Protestant's business the amounts paid for interest on a real estate first mortgage, which is a lien upon the buildings within which Protestant's business is operated, and which ex-

pense is a normal and traditional charge or expense for use and occupancy of the buildings within which Protestant's business is operated."

While the protest proceedings were pending, complainant was required to make another increase of wages pursuant to an arbitrator's award. This was brought to the attention of the Administrator by an application for an interim order granting a further adjustment by reason of increased labor costs incurred since the date of the Administrator's adjustment order of April 27, 1945. By order of June 11, 1945, the Administrator granted this interim relief, amending the adjustment order of April 27, 1945, so as to raise the allowable increase from 8.5% to 12%.

The protest came on for hearing before a Board of Review which, on October 1, 1945, filed its report and recommendations. The Board recommended that the protest be denied, except to the extent indicated in the following paragraph:

"We are advised that since the order protested was issued, the criteria applicable to persons in the Protestant's situation have been altered to permit an upward adjustment to prices yielding a 'management return' of 8%. The present record, however, does not reveal the considerations upon which this upward alteration was made. Doubtlessly, they were general in nature, having to do with the industry as a whole. Since the Protestant is clearly entitled to an upward adjustment upon the same terms now afforded all persons similarly situated we recommend an immediate reprocessing of the case by the National Office under the changed criteria. Since we are impressed with what seems to us the comparatively small return to the Protestant, considering the size of its operations and the investment involved, we also recommend interim action to be effective until the case can be reprocessed under the new criteria, consisting of an upward adjustment to such figure as the Administrator may determine as not likely to have to be reduced upon reprocessing under the changed criteria."

The text of the change in the adjustment criteria, above referred to by the Board of Review, does not appear in the record, but we have obtained the same from the OPA. The change was embodied in teletype instructions from the Acting Deputy Administrator for Price to "all regional price executives", dated August 29, 1945, the relevant portion of which is as follows:

"Effective immediately, sec. 5-1531.03 of the OPA Manual relating to instructions for judging applications for adjustment of the prices of laundry, dry cleaning, and related services is revised as follows:

"The individual 1941 base period is to be abandoned. Financial information to be required of an applicant shall be limited to the most recent 12-month period.

"Any concern with a current annual sales volume of $25,000 and over, shall be permitted a management return of eight per cent of sales. * * *

"In all other respects, sec. 5-1531.03 shall remain in effect."

Pursuant to the recommendation of the Board of Review, the Administrator on October 9, 1945, issued Interim Order L-50 temporarily allowing complainant an upward adjustment of 16% based on March, 1942, prices. Then, having reprocessed the application for adjustment upon the basis of complainant's operating statement for the year ending September 29, 1945, and having applied to this accounting data the revised adjustment criteria, the Administrator, on November 14, 1945, issued Order No. L-52 which granted a 16% surcharge by way of final action on the said application. This increase was calculated by the Administrator to be sufficient to afford complainant a management return of 8% of sales computed at complainant's March, 1942, prices. The management return as thus computed amounted to $193,724.12, which would allow complainant a return on its claimed invested capital of 4.5% after payment of executive salaries in the sum of $92,228.24 (disallowed as operating expense), and of 3.4% after payment of interest on mortgage in the sum of $24,585 (similarly disallowed as operating expense). We note this in passing, though the Administrator has chosen to use the concept of management return, rather

than return on investment, as the measure of financial hardship.

On December 11, 1945, the Administrator entered his order denying the protest in so far as relief had not already been granted by Orders L-50 and L-52. The pending complaint was thereafter filed in this court.

■ In the interest of uniformity of administration of § 16(a) of RMPR 165, the Administrator has followed his practice in the administration of similar individual adjustment provisions of other price regulations; that is, he has formulated administrative standards or criteria for determining whether established maximum prices subject an individual laundry to substantial financial hardship threatening its ability to continue supplying the service. We have hitherto approved the adoption of such standards as "not only permissible but highly desirable." Capitol Foundry Co. v. Bowles, Em.App. 1944, 146 F.2d 855, 857; American Brake Shoe Co. v. Bowles, Em.App. 1945, 151 F.2d 195, 197. The administrative standards are, of course, subordinate to, and they must be consistent with, the basic generalized standards expressed in the adjustment provision of the regulation itself.

■ Here, the Administrator has used a single test or standard in processing complainant's application for adjustment. He has allowed complainant such an increase in prices as will, according to his computation, yield complainant a management return of 8% on current operations. The formulation of the management return concept, as set forth in the OPA Manual and in the Revised Guide, both quoted supra, is certainly no model of clarity in its definition of "executive salaries". But it is not the function of this court to construe the words of the OPA Manual and the Revised Guide as we would the words of a statute. They are no more than an effort on the Administrator's part to set forth and explain his administrative practice in processing applications for adjustment under § 16(a). Whatever the ambiguities of expression, the important point is what the Administrator meant by the term "executive salaries", which constitute part of the management return as defined, in-

stead of being treated as operating expense. In this case the Administrator has explained clearly enough what he meant by "executive salaries". In classifying positions, he broadly differentiates between the functions of policy direction and general over-all supervision of the various aspects of the laundry business and supervisory jobs of a lower order directly related to supervision of the physical elements of laundry services. The line thus drawn may give rise to borderline cases in which the proper classification may be open to argument. But this in itself is no objection to the not unfamiliar distinction between "officers" and "employees". In respect to the higher level of supervisory positions—such as that of the president, the treasurer, the vice president in charge of sales—all salaries paid are excluded from operating expense and embraced in management return, whether or not the officer in question has any proprietary interest in the company as partner, stockholder, or otherwise. In respect to the lower level of supervisory positions—such as plant managers, superintendents, foremen, etc.—all the salaries paid to bona fide employees, whether or not in excess of the going rate, are deemed operating expense; but when such positions are held by persons having a proprietary interest in the company or by a relative of an owner, the salaries paid, so far as they are in excess of the going rate, are disallowed as operating expense and carried into management return.

■ The record contains two affidavits by the Acting Head of the Review and Analysis Section of the Service Trades Branch of the OPA—an official responsible for the uniform and consistent application of the management return standard to laundry adjustment applications. It appears from these affidavits that, in processing applications under § 16(a), the OPA has consistently applied the management return standard in the sense above set forth. Instances are cited of applications for adjustment by other laundries in which the Administrator has excluded from operating expense and carried into management return the salaries of executive officers who had no proprietary interest in the

company. Complainant has failed to establish its claim of discrimination against it in the administration of the adjustment provision.

The question remains whether the particularized management return standard is an appropriate administrative guide for applying the basic generalized standard contained in § 16(a) of the regulation. The salaries paid executive officers for performing necessary functions of management are no doubt part of operating expense in ordinary accounting practice. Management return, as the Administrator conceives it, is not equivalent to net profit as that would be calculated, say, for income tax purposes. The management return formula has been adopted by the Administrator for the limited purpose of determining whether an adjustment of prices is necessary to enable a laundry to continue operating, and, if so, how much. Its appropriateness for that purpose only is all we have to consider.

The rationale of the management return concept, as explained by the Administrator in his brief, is as follows:

"The significant aspect of the examination of earnings on the basis of management return is that in its application to the laundry industry generally, it provides a uniform and realistic method for determining the actual earnings of any particular company, and hence, the level at which it can realistically be expected to continue to render its services. Thus, in view of the common practice in this industry, because of its large proportion of family operated companies, of taking profit in the form of 'executive salaries,' treatment of executive salaries as operating expense would create a picture of earnings wholly unrelated to the true picture. The family operated companies, with proportionately substantial executive salaries, would appear to be earning little or nothing by comparison with the nonfamily operated companies, where actual profits are less likely to be hidden in the form of salaries. If, then, the Administrator should set up a uniform minimum percentage level of earnings with relation to sales to relieve apparent hardship and maintain the services, that level

might be disproportionately high for the family operation, and as a result discriminatory in their favor against the nonfamily operated organizations. In addition, of course, the level of prices would be raised unnecessarily, in direct contravention of the Administrator's basic duty. To avoid these results, the Administrator chose to treat, for all companies, whether or not family operated, executive salaries as a nonoperating expense, and then determined the level of return which, when including executive salaries, profit, interest, etc., all lumped under the concept of 'management return,' would operate to permit continuance of the needed services."

■ We can understand that a family operated laundry might have sufficient incentive to remain in business if its returns yielded enough to pay substantial salaries to the owners in their capacities as officers of the company, even though the corporation was making little or no net profit in the ordinary accounting sense of the term. That would be reason enough for the Administrator to exclude such salaries from operating expense in determining the need of a price adjustment. But it is not clear why, on the suggested rationale, such salaries should be so excluded in the case of a company not family operated, which employs officers to perform the necessary functions of management—officers who have no proprietary interest in the company. A management return of 8% of sales, computed by the Administrator's method, might well be a sufficient incentive to continued operation in the case of a family operated laundry, but not in the case of a large corporation which is not family owned and operated. Furthermore, the Administrator's explanation does not seem to fit in with his treatment of salaries on the lower supervisory level; here he includes as operating expense the salaries even of proprietors to the extent that they are not in excess of the "going rate", and he includes as operating expense the salaries of bona fide employees, whether or not in excess of the going rate.

The record, moreover, wholly fails to disclose any rational basis for the 8% factor adopted by the Administrator. It is

noted that, in its revised form and as finally applied in Order L-52, the Administrator's formula permitted a management return of 8% of sales to any concern with a current annual sales volume of $25,000 and over. The formula, therefore, has no relation to the applicant's individual base period experience, and in that respect is to be contrasted with the standard applied in American Brake Shoe Co. v. Bowles, supra. Nor does it appear that the Administrator's formula is derived from the base period experience of the industry generally. In Capitol Foundry Co. v. Bowles, supra, the Administrator had determined, upon adequate supporting evidence, that the average earnings of the industry in question during the base period 1936–1939 were approximately 4% of sales. He concluded from this that if an individual applicant for adjustment was realizing current profits of 4% or more of sales, there was reasonable ground to believe that he would be able to continue production. But in the present case the Administrator has made no similar finding as a basis for the adjustment formula adopted by him.

Therefore, the rule of thumb which the Administrator applied here cannot on the present record be upheld by us as a rational objective standard for implementing the adjustment provision in question. Hence the protest will have to be returned to the Administrator for further consideration.

After the present complaint was filed, the complainant, pursuant to our leave, introduced certain additional evidence designed to show the inadequacy of the adjustment granted by Order L-52 in the light of later operating figures. The Administrator objects that evidence as to the effect of the order, as shown by circumstances arising after the close of the proceedings before the Administrator, may not be looked to in determining the validity of the adjustment order. That may be so—we need not say. Since the protest proceedings are to be reopened before the Administrator, it will of course be appropriate for him to take into account the latest operating figures in determining the appropriate amount of the adjustment.

We think that there is no merit to the further objection of complainant that, under the Administrator's management return concept, interest paid on a loan secured by a mortgage of complainant's real and personal property is excluded from operating expense. It is argued that to include such interest in management return results in discrimination against complainant in favor of laundries which rent the premises upon which their business is conducted, such rental payments being treated as operating expense. It may be, as complainant has sought to prove, that the rental value of complainant's premises would be substantially in excess of the depreciation which it is allowed as owner, and that the amount of interest which it pays on the mortgage debt is less than the amount of this difference. The argument is fully and convincingly answered by the report of the Board of Review. We agree that "the Administrator is not required to distinguish, for purposes of administering Section 16(a) between laundries owning their own establishments and those which do not, beyond that appropriate under conventional accounting procedures, which allow depreciation to the owner and rent to the lessee." In accordance with normal accounting practices, interest on indebtedness is classified as a return on invested capital. In the "Manual for Uniform System of Accounting" published by the American Institute of Laundering, interest on indebtedness is put in one of the nonoperating expense accounts described as financial in nature and not directly a part of laundry operation.

A judgment will be entered setting aside the Administrator's order of December 11, 1945, which denied the protest, and remanding the case to the Administrator for further proceedings not inconsistent with this opinion.