**KINGAN & CO. v. BOWLES, Price Adm'r.**

**No. 124.**

United States Emergency Court of Appeals.
Heard at Indianapolis June 2, 1944.
Decided Aug. 3, 1944.

Paul Y. Davis, of Indianapolis, Ind. (Gustav H. Dongus, of Indianapolis, Ind., on the brief), for complainant.

Jacob D. Hyman, Chief, Court Review Price Branch, of Washington, D. C. (Richard H. Field, Gen. Counsel, Nathaniel L. Nathanson, Associate Gen. Counsel, and Carl H. Fulda and John J. Downey, Jr., Attys., all of the Office of Price Administration, all of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and MAGRUDER and LAWS, Judges.

MAGRUDER, Judge.

On December 26, 1942, Kingan & Co. filed with the Office of Price Administration ten applications for adjustment under Supplementary Order No. 9 and Procedural Regulation No. 6, requesting an adjustment of maximum prices established by Revised Maximum Price Regulation No. 169 applicable to beef carcasses or bone-in beef sold to the United States Army. The applications were similar to those involved in Armour & Co. v. Brown, Em.App.1943, 137 F.2d 233.

Supplementary Order No. 9, applicable generally to maximum price regulations theretofore issued or to be issued thereafter, reads, so far as now material, as follows (7 F.R. 5444):

"Any person who has entered into or proposes to enter into a contract with the United States or any agency thereof, * * * who believes that a maximum price established by any price regulation of the Office of Price Administration impedes or threatens to impede production of a commodity * * * which is essential to the war program and which is or will be the subject of such contract * * *, may file an application for adjustment of such maximum price in accordance with Procedural Regulation No. 6. Upon the filing of an application for adjustment and pending the issuance of an order granting or denying such application, contracts * * * may be entered into, or offered to be entered into, and deliveries may be made, at the price requested in such application. If, however, the order issued denies the application in whole or in part, the contract price shall be revised downward to the maximum price ordered, and if any payment has been made at the requested price, the applicant may be required to refund the excess."

Procedural Regulation No. 6 (7 F.R. 5087) prescribes the form of application to be made under Supplementary Order No. 9 and calls for precise details of cost data, and also balance sheets and income statements for the preceding five years.

Kingan's applications for adjustment were accompanied by exhibits purporting to show that the existing ceiling prices would result in losses to the applicant ranging from 65¢ to $2.43 per cwt. of dressed beef sold to the Army under the various contracts. The applicant sought specific increases, amounting in all to $3,-717.53, in maximum prices for carcass beef under contracts which it had undertaken with the United States Army.

The applications, together with similar applications by other persons, were denied on March 22, 1943, by Order No. 26 under Revised Maximum Price Regulation No. 169. On May 21, 1943, Kingan filed its protest against Order No. 26. This protest was denied by order of the Administrator issued June 23, 1943.

Subsequently, by order issued September 11, 1943, the Administrator vacated the order denying Kingan's protest. This was done in deference to our opinion in Armour & Co. v. Brown, Em.App.1943, 137 F.2d 233, 240, where a similar issue had been involved.

The Administrator then undertook a reconsideration of Kingan's protest, directed more specifically to the issue of fact as we had defined it in the Armour case. In that case we said:

"Supplementary Order No. 9 was designed to obviate delays in Government procurement of commodities essential to the war program. It was an invitation to sellers as to whom the established maximum prices were 'unreasonably low' to apply for adjustment upwards of the maximum prices of commodities to be sold to the Government, with permission to contract with the Government at such higher requested prices, subject to appropriate refund if the application for adjustment were subsequently denied by the Administrator. So far as government contracts are concerned, Supplementary Order No. 9 seems to make provision for relief of sellers who may have lost the right to challenge the validity of the regulation itself, or who may not be entitled to relief under the general adjustment provisions of the regulation, but whose continuing output is needed by the Government and is not likely to be forthcoming at prices which do not meet the costs of production."

Therefore the issue raised under the particular adjustment provision was whether the maximum prices established by the regulation impeded or threatened to impede the applicant's production of the commodities in question, and if so, what measure of relief was appropriate.

On November 13, 1943, the Administrator issued an intermediate opinion, referring to certain economic data of which he took official notice and to certain standard books on accounting in the meat packing industry, and setting forth at some length his theory as to the nature of the proof required to make out a case for relief under Supplementary Order No. 9.

The Administrator pointed to the fact that Kingan, like other big packers, is engaged in an integrated multi-product business and that it derives from the slaughter of cattle not only dressed carcasses but also the raw materials which it uses for the processing of many profitable byproducts. Manufacturing operations in the meat packing industry do not consist of assembling raw materials for the purpose of obtaining one finished product, but rather of separating or breaking down raw materials (cattle, etc.) into many parts, one of which (dressed carcass) is the major product, and the other parts of which are further processed into numerous byproducts. The Administrator quoted accounting authorities to the effect that while the cost of all joint products taken together may be computed, the cost of individual products cannot be accurately ascertained. He did not challenge the accuracy of the figures contained in Kingan's applications for adjustment indicating apparent losses on the sales of carcass beef under the existing ceilings. These losses were arrived at by an accounting procedure widely used in the industry whereby a cost is ascribed to the single product, carcass beef; the details of this accounting procedure need not concern us now. The Administrator claimed, however, that the apparent losses on carcass beef so arrived at are in the nature of "bookkeeping losses" and do not necessarily indicate that the established ceilings on carcass beef would make it unprofitable for the packer to continue the slaughter of cattle yielding carcass beef of the grades affected. Summarizing his position, the Administrator stated:

"If he continues the slaughter of those animals he necessarily continues production of the carcasses, because unlike other multiproduct manufacturers, he cannot stop production of that one commodity without also ceasing production of all other commodities derived from the cattle, and seriously interfering with production of many other items which are combined products of the slaughter of various meat animals. The question is, then, not whether the maximum prices of bone-in beef will induce or impede continued slaughtering, but whether those prices and the prices of the many related commodities will, in the aggregate, induce or impede such slaughtering. That issue can be resolved only by comparison of the current over-all profit position of the particular seller with his profit position during a representative peace-time base period."

The Administrator incorporated in the record a graph covering the years from 1937-1943, inclusive, for the Chicago market, purporting to show that since 1937 at

least, the returns to the packers from sales of carcass beef minus killing and selling expenses and plus the value of raw byproducts credited at the market price have generally been less than the price of the live steer. Yet, according to another table incorporated into the record by the Administrator, it appears that "during the period July 1, 1939 through July 1, 1943, years of great fluctuation in cattle supplies, the total amount of federally inspected slaughter was maintained and even increased."

Along with the intermediate opinion above referred to, the Administrator on November 13, 1943, issued an order providing Kingan with an opportunity to present rebuttal evidence. This order contained the following:

"For the reasons stated in that opinion, and under the authority vested in the Price Administrator in accordance with the Emergency Price Control Act of 1942, as amended, [50 U.S.C.A.Appendix § 901 et seq.] and Revised Procedural Regulation No. 1, it is hereby ordered that Protestant be, and it hereby is, provided with an opportunity to file with the Secretary of the Office of Price Administration within 30 days from the date of this order, an original and four copies of a statement, under oath, containing evidence in rebuttal of the economic data and other evidence contained in the opinion accompanying this order and hereby incorporated in the record of this proceeding.

"It is further ordered that Protestant be, and it hereby is, provided with an opportunity to file with the Secretary of the Office of Price Administration within 30 days from the date of this order, an original and four copies of a statement, under oath, containing evidence with respect to its over-all financial position during the period 1936 to date, and evidence with regard to the number of cattle slaughtered by it during the period covering the fiscal years ending July 1, 1938 to July 1, 1943

or in the alternative to authorize the War Food Administrator to release to the Price Administrator for inclusion in the record of this proceeding the slaughtering reports submitted by Protestant to the War Food Administrator, and such other relevant evidence as Protestant may deem pertinent to the disposition of its protest in accordance with the principles laid down in the opinion accompanying this order."

On December 11, 1943, Kingan submitted a statement to the Administrator to the effect that it did not desire to avail itself of the opportunity afforded "to present evidence as to its over-all financial position from 1936 to date and evidence as to the actual number of cattle slaughtered. We submit that in view of the decision in the Armour & Co. case the Administrator can adopt only one straightforward course of action without further resort to specious theory or argument, and that is, to grant forthwith Protestant's applications for adjustment." Accompanying this statement complainant submitted an affidavit by its vice-president stating generally that the prices established by the regulation produced a net realization "less than the cost of such beef," a statement which added nothing to the exhibits attached to the applications for adjustment. The affidavit further alleged that Kingan had endeavored to persuade the Army to purchase its requirements of beef from other sources of supply; and that "Because of the continuing interference with the production of beef, due to the unreasonably low maximum price for the product established by the Office of Price Administration," it has been necessary for the Army to resort to the establishment of quotas, the issuance of priority orders and other expedients for the purpose of forcing meat packers, including Kingan, to supply this product "even though the operation might entail a loss to the packer."[1]

At this time complainant was under the impression that our opinion and judgment

---

[1] The Administrator in his opinion accompanying the order denying the protest makes this comment: "As for the second point, the claim that the army had difficulty securing all the beef it required does not establish that the maximum prices were the cause of the difficulty. Experience during the war has fully confirmed the fact that of all fresh meats, beef is the kind most desired by consumers. Accordingly, even when the price for sales to the army yields an adequate profit, it is to be expected that sellers will prefer selling through normal civilian channels either to maintain those markets as outlets for beef or to facilitate the sale of other meat products." For this reason, "the mere fact that priority orders were issued to Protestant does not establish that the maximum prices fixed by the Regulation impeded its production of beef for the Army."

in the Armour case had in effect directed the Administrator to grant the applications for adjustment under Supplementary Order No. 9. We made clear in our second opinion in the Armour case, handed down December 14, 1943, that this was not so. Armour & Co. v. Bowles, 139 F.2d 495. Shortly thereafter the Administrator expressed a willingness to give complainant a further extension of time within which to file the evidence and rebuttal evidence referred to in the order of November 13, 1943. To this the attorney for the complainant replied that "our client is willing that the Protest be disposed of on the present record."

The Administrator denied the protest by order issued January 31, 1944, following which Kingan filed its complaint in this court.

In Armour & Co. v. Brown, 137 F.2d 233, we said that if the applicant for adjustment showed that the maximum price established in the regulation would result in substantial losses upon the sale of carcass beef to the Army, this would make out a prima facie case for relief under Supplementary Order No. 9. We added (page 240 of 137 F.2d): "Nor can much significance be attached to the point that Armour may still be making a profit in the 'over-all operations' of its ramified business; this in itself, under normal circumstances, would hardly assure the continued production of an item that can only be sold at a loss." Upon reconsideration of Kingan's protest the Administrator addressed himself to this point, in the manner above indicated. He made a reasoned analysis of the cost accounting problem involved, and explained why he thought the figures submitted by Kingan for losses on carcass beef were not a reliable indication that the ceiling prices were impeding the slaughter of cattle and the consequent production of carcass beef. Kingan did not see fit to introduce any evidence in rebuttal of the economic data incorporated into the record in support of the Administrator's position.

In addition, Kingan declined to submit figures as to the number of cattle it had slaughtered during the years 1938-1943, which might have indicated whether the regulation was really curtailing or impeding the slaughter of cattle so far as it was concerned. Nor was Kingan willing to submit its over-all profit figures for a representative period of years. Perhaps such figures would not be relevant to the issue here involved if they included profits from products in no way derived from the slaughter of cattle—we reserve judgment as to this. But at least it might have been illuminating, on the issue of fact presented, to examine Kingan's aggregate profits for the years 1936-1943 attributable to the slaughter of cattle and the processing of the many parts derived therefrom. It is the Administrator's position that Kingan would hardly discontinue the slaughter of cattle and thereby deprive itself not only of fresh beef but also of numerous byproducts, so long as its over-all profits on the related operations continued at a satisfactory level.

Complainant had the burden of proof to make out a case for adjustment of prices. It has failed to sustain this burden. It has done little to blunt the force of the Administrator's analysis; certainly we have not been convinced that the Administrator's position is without rational support. On this record we cannot say that the Administrator acted arbitrarily in declining to grant the relief sought.

The complaint is dismissed.