## UNITED STATES *v.* JOHN J. FELIN & CO., INC.

No. 17. Argued May 7, 1947.—Reargued November 18–19, 1947.— Decided June 14, 1948.

*Assistant Solicitor General Washington* argued the cause for the United States. With him on the brief were *Assistant Attorney General Sonnett, Paul A. Sweeney* and *Harry I. Rand.*

*Arthur L. Winn, Jr.* argued the cause for respondent. With him on the brief were *Wilbur La Roe, Jr.* and *Frederick E. Brown.*

MR. JUSTICE FRANKFURTER announced the judgment of the Court and delivered an opinion in which THE CHIEF JUSTICE and MR. JUSTICE BURTON concurred.

This is a claim for just compensation, based on the Fifth Amendment, by a slaughterer whose meat products the Government requisitioned for war purposes. The Court of Claims awarded damages above the maximum prices fixed by the Office of Price Administration for such products and measured by what that court deemed the replacement cost of the requisitioned property. 107 Ct. Cl. 155, 67 F. Supp. 1017. The implications of this ruling reach far, and so we brought the case here. 330 U. S. 814.

While the immediate facts of this controversy are few and undisputed, they can be understood only in connection with the recognized facts in the meat industry. Of these we must take judicial notice inasmuch as we must

translate the idiom of the industry into vernacular English. Also, of course, we must consider the facts in the context of the rather intricate system of meat price regulation by O. P. A.

The respondent was engaged in the business of packing pork products in Philadelphia. It bought hogs in Chicago, St. Louis, and Indianapolis and transported them to Philadelphia where they were slaughtered and converted into various pork cuts and products. It sold these products to retail dealers in Philadelphia, and it had also supplied pork products to Government agencies.

On January 30, 1942, the President approved the Emergency Price Control Act. 56 Stat. 23, 50 U. S. C. App. (Supp. V, 1946) § 901. Accordingly, the Price Administrator, by a series of regulations, established maximum prices for dressed hogs and wholesale pork cuts. Revised Maximum Price Regulation No. 148, issued on October 22, 1942, governed the pork cuts here involved. 7 Fed. Reg. 8609, 8948, 9005; 8 Fed. Reg. 544.

To meet the food needs entailed by the war, the President under the authority of the Second War Powers Act, 56 Stat. 176, 50 U. S. C. (Supp. V, 1946) § 633, created the Food Distribution Administration, with the Secretary of Agriculture as its head. E. O. 9280, 7 Fed. Reg. 10179. This Administration was given authority to assign food priorities, to "allocate" food to governmental agencies and for private account, and to assist in carrying out the program of the Lend-Lease Act of March 11, 1941, 55 Stat. 31. To carry out the task thus delegated by the President, the Food Distribution Administration issued to each packer operating under federal inspection a priority order calling for delivery of a proportionate part of the total quantity needed at the particular time.[1] A packer's

---

[1] In 1943 there were 308 hog slaughterers whose establishments operated under federal inspection. Livestock, Meats, and Wool Market Statistics and Related Data 1945, compiled by the Livestock

quota was based on the ratio of meat produced in his plant to the total production in all federally inspected plants.

In conformity with this system, the respondent, on February 2, 1943, was requested to deliver 225,000 pounds of lard and pork products to the Federal Surplus Commodity Corporation for delivery under the Lend-Lease program. The respondent was advised that this order was to be filled in preference to any other order or contract of lower priority, and at the applicable O. P. A. ceiling prices. Insisting that it could no longer afford to sell to the Government at ceiling prices, respondent refused to make delivery.

On March 1, 1943, the Food Distribution Administration, exercising powers not questioned, issued an order requisitioning the lard and pork products in controversy.[2] On March 3, 1943, the property was duly seized in respondent's Philadelphia packing house. On March 24, 1943, respondent filed its claim with the Administration for "just compensation" for taking this property. Its total claim was $55,525, of which $16,250 was for lard and $39,275 for pork cuts. On May 7, 1943, the Administration, by way of preliminary determination of the just compensation for the requisitioned property, fixed the value of the lard at $15,543.78 and the pork cuts at $25,112.50. These amounts were based on the O. P. A.

Branch, Production and Marketing Administration, United States Department of Agriculture, p. 31. In 1942 there had been only 218 hog slaughtering establishments under federal inspection, and in 1944 there were 322. *Ibid.*

[2] The requisitioned property consisted of the following:

40,000 pounds Cured Regular Hams, 14 to 18 lb. range
40,000 pounds Cured Clear Bellies, 10 to 14 lb. range
15,000 pounds Cured Picnics, 6 to 10 lb. range
30,000 pounds Salted Fatbacks, 8 to 12 lb. range
100,000 pounds Refined Pure Lard, 1 lb. prints (30 lbs. to carton)

ceiling prices applicable to these products. On May 22, 1943, the preliminary award was made final. Respondent accepted in full payment the award as to the lard; it refused to accept the determination as to the pork cuts and, in accordance with the statutory procedure in the case of rejection of such an award, was paid half of it. On June 24, 1943, respondent instituted this action in the Court of Claims to recover the additional amount which when added to the $12,556.25, the half of the Government's valuation for those cuts, would constitute "just compensation" for what the Government had taken.

The Court of Claims referred the proceeding to a commissioner, who took evidence and reported to the court. Upon the basis of his report and the underlying evidence, the Court of Claims found as a fact that the replacement cost of the requisitioned pork cuts at the time and place of the taking was $30,293, and concluded, as a matter of law, that such replacement cost and not the maximum ceiling price was the proper measure of damages for the taking. We heard argument at the last Term, and after due consideration deemed it appropriate to order reargument at this Term.[3]

---

[3] After the case was taken under advisement, following reargument, a matter was brought to our attention which calls for consideration, however summary. We were advised that on March 23, 1943, the respondent filed with the O. P. A. an "Application for Adjustment of Maximum Prices for Commodities or Services under Government Contracts or Subcontracts," pursuant to Procedural Regulation No. 6, 7 Fed. Reg. 5087, and Supplementary Order No. 9, 7 Fed. Reg. 5444. (See 7 Fed. Reg. 5088 for the form of the application.) The purpose of these regulations was to afford opportunity for relief to sellers who had made, or proposed to make, "contracts or subcontracts" with the Government. This application had lain dormant from the date of its filing until December 13, 1947, when we were advised by counsel for the Government that it was now in the files of the Reconstruction Finance Corporation, which is third in the chain of title from the O. P. A., through the Office of Temporary Controls, charged with the administration of these two regulations. On December 15, 1947,

At the outset it is important to make clear what it is we are called upon to decide. The conventional criterion

counsel for the respondent advised the R. F. C. that it withdrew the application insofar as it pertained to the requisitioned commodities in controversy here.

While the Government does not suggest that the dormancy of this application renders present proceedings, if not moot, premature, such apparently is the intimation. If the regulations in fact authorized one who is not a "contractor or subcontractor" in the ordinary meaning of those terms to obtain special administrative relief apart from the statutory scheme relating to requisitioned property, technical issues would have to be faced which we need not particularize. Counsel for the Government advise us that a counsel for the R. F. C. has now interpreted the regulations not only (1) as applicable to requisitioned commodities, but (2) as authorizing retroactive price adjustments for requisition transactions completed before readjustment is sought. Not unnaturally, the Government states that the applicability of this procedure for readjustment "to requisitioned commodities may not be readily apparent from its terms." While normally we accept the construction placed upon a regulation by those charged with its administration, we must reject a construction that is not only as unnatural as what is now proposed but comes to us *post litem motam* five years after the application. It should also be pointed out that the construction now placed upon the regulations is not made by the administration that promulgated it but by the second successor agency for liquidating what is left of this administration. With due regard for the respect we owe to administrative rulings in their normal setting, it would require such a remaking of the regulations as reason and fair dealing here reject. The provisions for readjustment of contracts relate to a transaction in which the seller and the purchasing agency of the Government were in agreement as to the contract price. The price was paid, subject to the approval of the application for adjustment. If so approved, the seller retained the purchase price; if disapproved, the seller had to make a refund. See *Armour & Co.* v. *Brown,* 137 F. 2d 233, 240. In the case of a requisitioned commodity, certainly prior to the filing of an application, no amount is agreed upon, and no provision for refund has been made. In short, we reject this belated and novel construction and are of the opinion that the pendency of this moribund application before the R. F. C., now withdrawn by the respondent, was no bar to this suit.

for determining what is "just compensation" for private property taken for public use is what it would bring in the free, open market. *E. g., Olson* v. *United States,* 292 U. S. 246, 255; *Brooks-Scanlon Corp.* v. *United States,* 265 U. S. 106, 123; *L. Vogelstein & Co.* v. *United States,* 262 U. S. 337, 340. But there must be a market to make the criterion available. Here there was a market in which the respondent could have sold the pork cuts, but it was not a free and open market; it was controlled in its vital feature, selling price, by the O. P. A. It is this fact that creates the problem of the case, assuming that the case is not dogmatically disposed of by holding that inasmuch as the maximum price is the only price which respondent could legally have got for its goods it is just compensation. We are not passing on the abstract question whether a lawfully established maximum price is the proper measure of "just compensation" whenever property is taken for public use. We are adjudicating only the precise issues that emerge from this case.

The Second War Powers Act, 1942, under which respondent's property was authorized to be taken, restricted compensation for the taking to that which the Fifth Amendment enjoins. 56 Stat. 176, 181. In enforcing this constitutional requirement "the question is what has the owner lost, not what has the taker gained." *Boston Chamber of Commerce* v. *Boston,* 217 U. S. 189, 195; *McGovern* v. *New York,* 229 U. S. 363. Respondent's sole claim is for the pecuniary equivalent of the property taken. This is not a situation where consequential damages, in any appropriate sense of the term, are urged as a necessary part of just compensation. Respondent does not claim such damages on the theory that, in order to protect its good will, it had to supply its regular customers and that this compelled replacement of the requisitioned pork products by the purchase, slaughter,

and processing of live hogs.[4]   Cf. *United States* v. *General Motors Corp.*, 323 U. S. 373, 382; *United States* v. *Petty Motor Co.*, 327 U. S. 372, 377–78; *United States ex rel. T. V. A.* v. *Powelson,* 319 U. S. 266, 281–82. Respondent claims that replacement cost is the proper measure of the value of the property when requisitioned. This action was brought to recover damages which the respondent would suffer, so it maintains, if it accepted the Government's offer of the applicable ceiling prices in satisfaction of "just compensation." The burden therefore rests on the respondent to prove the damages it would suffer by not receiving more than the ceiling prices.   *Marion & Rye Valley R. Co.* v. *United States,* 270 U. S. 280, 285.

The Court of Claims found that the principal item in the cost of processing respondent's products was what it had to pay for live hogs; that, inasmuch as live hogs were not then covered by price regulation, the Chicago market quotations governed price in the packing industry; that the Chicago average live hog price was $15.59 during March 1943;[5] and that, on the basis of this price, the

---

[4] If the respondent had sold the pork products in controversy here to its regular customers, it would have done so at the applicable ceiling prices.   If the Government had then requisitioned the property from these customers, there would have been no question that the ceiling prices would have been the measure of just compensation.

[5] This was obviously not the cost of the hogs from which the pork products requisitioned by the order of March 1, 1943, were processed. The relevant hogs were purchased in some previous month and at a lower cost.   The Chicago average was $15.35 in February and $14.78 in January, 1943, and $14.01 in December and $13.96 in November, 1942.   Livestock, Meats, and Wool Market Statistics and Related Data 1945, compiled by the Livestock Branch, Production and Marketing Administration, United States Department of Agriculture, p. 54.   Moreover, these were the average prices for average weights of hogs.   *Ibid.*   The Government took specific pork products which

replacement cost for the requisitioned property was $30,293. We are of opinion that in reaching this conclusion the court below failed to take into account decisive factors for the proper disposition of the action brought by the respondent.

We are dealing with a claim for damages arising out of a transaction pertaining to a particular industry, and the transaction cannot be torn from the context of that industry. It is practically a postulate of the slaughtering industry that replacement cost does not afford a relevant basis for determining the true value of the industry's products. "Manufacturing operations in the meat packing industry do not consist of assembling raw materials for the purpose of obtaining one finished product, but rather of separating or breaking down raw materials (cattle, etc.) into many parts, one of which (dressed carcass) is the major product, and the other parts of which are further processed into numerous byproducts." *Kingan & Co.* v. *Bowles,* 144 F. 2d 253, 254. In consequence, cost in the industry generally is like a fagot that cannot be broken up into simple, isolated pieces. See Greer, Packinghouse Accounting (Prepared by the Committee on Accounting of the Institute of American Meat Packers), *passim.* "The accounting procedure in the hog business is even more complicated than that of the cattle, calf, or sheep business, because the operations involve a greater breaking up of the dressed carcass and more numerous processes extending over considerable periods of time." *Id.* at 33–34. The problem is one of "joint cost" in a business which "produces no single major product," *id.* at 213, with the result that no accountant has thus far "been able to devise a method yielding

were processed from hogs of a definite weight for which the respondent paid specific prices in the Chicago, St. Louis, or Indianapolis markets.

by-product or joint-cost figures which does not embody a dominance of arbitrariness and guesswork." Hamilton, *Cost as a Standard for Price,* 4 Law and Contemp. Prob. 321, 328; cf. Greenbaum, *The Basis of Property Shall Be the Cost of Such Property: How is Cost Defined?,* 3 Tax L. Rev. 351, 356–59.

If, as suggested in argument, a hog were nothing but an articulated pork chop, and the processing of edible and inedible by-products were not characteristic of the industry, the price of a live hog might well represent the collective cost of the derivative pork cuts. The pork chop, however, is but one of the many edible hog products. According to an estimate about the time of the requisitioning of these pork cuts, there were more than 200 pork items (exclusive of sausage products) in the market. See Supplementary Statement of Considerations for Revised Regulation No. 148, Pike and Fischer, 3 OPA Food Desk Book 46,151. "Most pork products," the Administrator found, "are consumed in a cured or processed state. Fresh pork products, such as pork chops and fresh ham, represent not over 20 per cent of the vast quantity of pork which moves by rail. The remaining 80 per cent reaches the consumer in a wide variety of processed forms, including dried, dry cured, sweet pickled, smoked, cooked, baked, and canned." *Id.* at 46,141. It deserves noting that the requisitioned products in controversy included cured regular hams, cured clear bellies, cured picnics, and salted fatbacks.

The petitioner was also engaged in by-product processing,[6] for the Government took from him 100,000 pounds

---

[6] There are "numerous by-products," and the computation of the values for "such by-products as casings, grease, fertilizer, and hog hair, is rather complex." Greer, Packinghouse Accounting (Prepared by the Committee on Accounting of the Institute of American Meat Packers) (1929) at 213 and 219, respectively; see, generally, Clemen, By-Products in the Packing Industry (1929); Moulton and Lewis,

of refined pure lard. For the value of the lard the respondent accepted the administrative award.[7] Admittedly, part of the cost of the live hog must be charged to by-products. However, any method of apportioning the total cost to the by-products is highly speculative.[8]

Since so much speculative approximation and guesswork entered into the determination of cost, selling price, and profit, the industry, naturally enough, was in almost continuous controversy with the Price Administrator about them. The respondent was party to these controversies. On July 17, 1942, it filed a protest against Maximum Price Regulation No. 148 which was consolidated

---

Meat through the Microscope (rev. ed. 1940); Readings on By-Products of the Meat Packing Industry, collected by the Institute of Meat Packing, University of Chicago (1941); Rhoades, Merchandising Packinghouse Products, Institute of Meat Packing, University of Chicago (1929); Tolman, Packing-House Industries (1922).

[7] Since, as we hold, the value of the individual products can only be determined by proportionate allocation from the over-all operations, it seems to us that respondent's acceptance of the award as to the lard was hardly consistent with its rejection of the award as to the other pork products.

[8] "On much of the material transferred [from one of the slaughterer's departmental accounts to another], such as blood, bones, tankage, glue stock, etc., there is no ascertainable outside market, and the packers must perforce place quite arbitrary valuations on this material having no probable relation to either cost or market. Again certain products are in the green stage when transferred, and an outside market only obtains for the finished stage, with the result that arbitrary deductions must be made from the finished market, estimated to establish a nonexistent 'green' market. The certification of internal transfer prices presents, accordingly, an almost interminable problem to any outside reviewing body." Report of the Federal Trade Commission on the Meat-Packing Industry (1920), Part V, 56. The industry's position as to the utilization of such cost allocations and the Price Administrator's objections thereto are quoted fully and discussed in *Armour & Co.* v. *Bowles,* 148 F. 2d 529, 535–39.

with the protest of 115 other pork slaughterers against this regulation. On the basis of calculations as to the cut-out value or replacement cost of various pork cuts, the slaughterers contended that the regulation did not allow them sufficient operating margin over the cost of live hogs. In rejecting the protest, on April 23, 1943, the Administrator made this ruling: "The interdependence of all phases of the operations of packing establishments makes precise evaluation of the relationship between prices on dressed and processed meats and live hog prices impossible except in terms of the over-all financial position of the industry." *In the Matter of Rapides Packing Co.,* Pike and Fischer, 1 OPA Opinions and Decisions 243. The respondent, on March 8, 1943, had also protested, again on the basis of the cost of live hogs, against the revision of the regulation. This protest was consolidated with those of 15 other pork slaughterers and, substantially on the ground taken in the *Rapides Packing Co.* case, this second protest was likewise rejected by the Administrator. *In the Matter of Greenwood Packing Plant,* Pike and Fischer, 1 OPA Opinions and Decisions 296, 299.

Review by the Emergency Court of Appeals was not sought,[9] although the first denial of respondent's claim for the replacement cost of pork cuts, based on live hog prices, came shortly after the Government's requisitioning of the products as to which he now makes the same contention. It is noteworthy that the pork price margins were almost the only meat price margins which were not challenged before the Emergency Court of Appeals in

---

[9] It is also significant that none of the other 130 protestants sought review in the Emergency Court of Appeals. Cf., *e. g., Kingan & Co.* v. *Bowles,* 144 F. 2d 253, and *Armour & Co.* v. *Bowles,* 148 F. 2d 529, for that court's views on replacement cost as a basis for the determination of value.

what has been called "the battle of the meat regulations." See Hyman and Nathanson, *Judicial Review of Price Control: The Battle of the Meat Regulations,* 42 Ill. L. Rev. 584.

The considerations which underlay the Administrator's meat price determinations are most pertinent to the solution of our immediate problem. The result of his analysis was that the profit-and-loss data on a slaughterer's entire operations were the only dependable figures from which the fairness of meat prices could be deduced. The Administrator pointed out that the industry, on the basis of its accounting figures, had historically lost money on its meat sales.[10] Since, however, by taking the by-product sales into full account its operations as a whole were highly profitable, these meat sale losses were "more in the nature of bookkeeping losses which failed to take fully into account the integrated nature of the industry." These views were approvingly quoted by the Emergency Court of Appeals in *Armour & Co.* v. *Bowles,* 148 F. 2d 529, 535.

In both of the consolidated proceedings to which the respondent was a party, the Administrator explicitly requested to be furnished with the industry's profit-and-loss data. In the earlier proceeding, no proof of loss was filed by any of the protestants. *In the Matter of Rapides*

---

[10] "It is a notable fact, that according to the present method of departmental accounting, the packers are in the habit of showing low profits or even positive losses in the carcass-meat departments, while at the same time exhibiting large profits in the by-products or 'specialty' departments, the chief reason for this somewhat extraordinary state of affairs being found in the valuations placed upon transfers." Report of the Federal Trade Commission on the Meat-Packing Industry (1920), Part V, 56. While a great deal of time has passed since this 1920 report, the Price Administrator reached the same conclusions in 1943, and the Emergency Court of Appeals quoted the report more fully in 1945. See *Armour & Co.* v. *Bowles,* 148 F. 2d at 537.

*Packing Co., supra.* In the second proceeding the Administrator made this finding:

> "The three Protestants who submitted further evidence did not even thus sustain their claims of individual hardship. One of them showed a net profit of $60,492.44 for the five months period ending March 27, 1942; another a net profit of $6,838.00 for the three months period ending April 1, 1943, and the third failed to submit a profit and loss statement and balance sheet although specifically requested to do so." *In the Matter of Greenwood Packing Plant, supra,* at 297.

Not merely does the industry generally seem to have prospered under price control,[11] but so did the respond-

---

[11] See War Profits Study No. 14, Office of Research, Financial Analysis Branch, Office of Price Administration, Office of Temporary Controls (1947) pp. 17, 45–47, 73–75. This is a study of the profits of 520 food processors, but the foregoing references were to the separate tabulations concerning the 79 meat packers included in the study. The financial data was compiled from Moody's Industrials, Standard & Poor's Corporation Records, and the OPA Financial Reports submitted by the packers. *Id.* at 19. Of the total 79 meat packers, 54 are processing slaughterers, 10 non-processing slaughterers, and 15 non-slaughterers. The comparison between the 1943 operations and the base period (1936–39 average) operations shows for the 54 processing slaughterers: *Net sales:* 1943—$4,575,528,000 (after renegotiation refunds)/base period—$2,382,211,000; *Profits before income taxes:* 1943—$125,463,000 (after renegotiation refunds)/base period—$24,415,000; *Profits after taxes:* 1943—$50,402,000 (after renegotiation refunds)/base period—$19,255,000; *Return on sales:* 1943—2.7%/base period—1.0%; *Return on net worth:* 1943—19.5%/base period—4.1%; *Return on invested capital:* 1943—16.5%/base period—4.1%. *Id.* at 45, 47. For the 10 non-processing slaughterers, the comparison shows: *Net sales:* 1943—$62,098,000/base period—$29,927,000; *Profits before income taxes:* 1943—$1,027,000/base period—$184,000; *Profits after taxes:* 1943—$390,000/base period—$147,000; *Return on sales:* 1943—1.7%/base period—.6%; *Return on net worth:* 1943—28.0%/base period—6.3%; *Return on invested capital:* 1943—25.5%/base period—5.9%. *Ibid.*

ent [12] despite the fact that throughout the period in controversy it continued to buy live hogs at prevailing prices and to sell pork products derived from them at the authorized ceiling prices, even when this meant selling its pork products below the price that the Court of Claims found to be their replacement cost value.[13]

Most pertinent, therefore, are the pronouncements of the packing industry made before these matters became embroiled in price-fixing litigation. "The cost of a dressed hog carcass, or of a lot of dressed hog carcasses, may be determined quite satisfactorily; but when a carcass is cut up into its various merchantable parts, all record of cost is lost, as it is impossible to determine the cost of any of these cuts." Greer, Packinghouse Accounting (Prepared by the Committee on Accounting of

---

[12] Respondent's income account for the year ending December 31, 1943, shows:

| | | |
|---|---:|---:|
| "Net sales | $14,225,056 | |
| Cost of sales | 12,950,785 | |
| Selling, etc., exp | 869,770 | |
| Operating profit | 404,500 | |
| Other income | 18,717 | |
| Total income | 423,217 | |
| Misc. deductions | 13,229 | |
| Income taxes | 176,619 | |
| *Net income* | 233,369 | |
| Earn., pfd. share | | $40.21 |
| Earn., com. share | | 17.97" |

See Moody's Manual of Investments, American and Foreign, Industrial Securities, 1944, p. 647. The 1943 net income figure of $233,369 compared favorably with preceding years: 1942—$73,292; 1941—$150,069; 1940—$148,164; and 1939—*d$76,936*.

[13] The court below found that in order to protect its good will and keep its organization intact, "Throughout the period mentioned [prior to and after the March 1943 requisition], plaintiff [respondent] continued to buy live hogs at prevailing prices and to sell pork products derived from them at the ceiling prices authorized by regulations of the Office of Price Administration, even when the cost of live hogs was greater than the wholesale prices of the products obtained from them." 67 F. Supp. at 1022.

the Institute of American Meat Packers), p. 246, and also pp. 43, 58, 61–62. Since the "results for the hog business as a whole can be found only by adding the profits or losses for all merchandising departments," *id.* at 218, the only accurate formula for costs in hog slaughtering is a profit-and-loss statement for the entire operations. *Id.* at 43–44.

It is as old as the common law that an allegation purporting to be one of fact but contradicted by common knowledge is not confessed by a demurrer.[14] Of course, findings of fact are binding on this Court, but if this Court had to treat as the starting point for the determination of constitutional issues a spurious finding of "fact" contradicted by an adjudicated finding between the very parties to the instant controversy, constitutional adjudication would become a verbal game.

There are facts and facts, even in Court of Claims' litigation. It is the function of the Court of Claims to make findings. But when a judgment based on such findings is here brought in question it is the function of this Court to ascertain the meaning of the findings in order to determine their legal significance. The judgment of the court below that "replacement cost" is the proper measure of just compensation and the mode by which it reached the amount of that cost are inescapably enmeshed in considerations that are clearly familiar issues of law and particularly of constitutional law. Where the conclusion is a "composite of fact and law," *Cedar Rapids Gas Light*

---

[14] "If one enters my close, and with an iron sledge and bar breaks and displaces the stones on the land, being my chattels, and I request him to desist, and he refuses, and threatens me if I shall approach him; and upon this I, to prevent him from doing more damage to the stones, not daring to approach him, throw some stones at him *molliter et molli manu,* and they fall upon him *molliter,* still this is not a good justification, for the judges say that one cannot throw stones *molliter,* although it were confessed by a demurrer . . . ." *Cole* v. *Maunder,* 2 Roll. Abr. 548 (K. B. 1635) (as translated from the Norman French in Ames, Cases on Pleading (1875) 2).

*Co.* v. *Cedar Rapids,* 223 U. S. 655, 668, this Court may certainly hold that as a matter of law the findings are erroneous. See, *e. g., Washington ex rel. Oregon R. & N. Co.* v. *Fairchild,* 224 U. S. 510, 528. Even when this Court reviews State court judgments involving constitutional issues it "must review independently both the legal issues and those factual matters with which they are commingled." See *Oyama* v. *California,* 332 U. S. 633, 636 (and the authorities therein cited). Similarly, findings concurred in by two courts do not control the decision here where "facts and their constitutional significance are too closely connected" and "the standards and the ultimate conclusion involve questions of law inseparable from the particular facts to which they are applied." *United States* v. *Appalachian Electric Power Co.,* 311 U. S. 377, 404. Even where the parties to the litigation have stipulated as to the "facts," this Court will disregard the stipulation, accepted and applied by the courts below, if the stipulation obviously forecloses real questions of law. See, *e. g., Swift & Co.* v. *Hocking Valley R. Co.,* 243 U. S. 281.

The prior proceedings between the same parties, as to which we would be blind not to take judicial notice, as well as the unquestioned facts pertaining to the meat industry are relevant to interpret the findings of the Court of Claims. We have concluded that here "replacement cost" is a spurious, *i. e.* non-legal, basis for determining just compensation. It is as though the Court of Claims had based its opinion on a balance sheet and we had to interpret the balance sheet into actualities. And so we hold that, as a matter of law, the court below erred in utilizing replacement cost as the basis for determining what constituted just compensation.

When due regard is given to the findings of the Court of Claims, they fail to establish that the compensation proffered by the Government for the requisitioned pork cuts, based on the maximum ceiling prices, falls short of

"just compensation." We are therefore not called upon to consider whether as a matter of constitutional law prices fixed by the Government for the sale of commodities are the measure of "just compensation" for commodities seized by the Government. As the conflict of opinion here indicates, that is a debatable issue which, since we can, we must avoid adjudicating. See *Spector Motor Co.* v. *McLaughlin,* 323 U. S. 101, 105.

The burden of proving its case was upon the respondent. The nature of this burden was to prove, in light of the governing facts of the industry, that the administrative award for the taking of respondent's property was less than just compensation, based as it was on prices which the Administrator had established for those products and which had been left undisturbed by the process devised by Congress for assuring the fairness of these prices. By evidence merely of bookkeeping losses, respondent did not carry its burden of proving actual damage. Just compensation is a practical conception, a matter of fact and not of fiction. Respondent introduced no evidence, and the Court of Claims made no findings, to establish a loss based on its total operations during the period relevant to the slaughtering of the hogs from which the requisitioned products were processed.[15] On

---

[15] The court below found that the $25,112.50 award was the equivalent of the ceiling price of the requisitioned property when sold at wholesale in carload quantities at Philadelphia on March 3, 1943, the date the Government took possession and title; that the respondent customarily sold its products at wholesale but in lots of less than 500 pounds each and that it made delivery to its customers by means of 57 route trucks; that the ceiling price if the requisitioned property had been sold in this customary manner would have been $26,362.50; that the difference between the two ceiling price figures resulted from the $1 per cwt. deduction established by the price regulation for sales in carload quantities; and that the "$1.00 differential was intended to partially defray the expense incurred for delivery and sale in less than carload quantities." 67 F. Supp. at 1022. Respondent did not challenge the reasonableness of the $1 differential in

the basis of such figures it would be necessary to determine by reasonable allocations the portion of the loss properly attributable to the goods seized by the Government. In the proceedings below the respondent neither alleged such a loss nor submitted proof in support of it. Since it has not maintained its burden of proving that the ceiling price award entails damages, the judgment of the Court of Claims cannot stand.

*The judgment is reversed with directions to the Court of Claims to enter a judgment for the respondent in an amount not exceeding $12,556.25, with interest on the amount of $25,112.50 from March 3, 1943, the date of the requisition, to May 22, 1943, the date of the final award made by the Director of the Food Distribution Administration.*

MR. JUSTICE REED, with whom MR. JUSTICE BLACK and MR. JUSTICE MURPHY join, concurring in the judgment.

I agree with the disposition of this case made by JUSTICE FRANKFURTER's opinion. However, I cannot concur in the reasoning by which that result is reached. That opinion holds that the respondent is not entitled to recover

---

its petition filed with the court below. Respondent argues here, however, that the effect of the differential is to reduce the return it would have netted if it had been allowed to sell the requisitioned products in small quantities. But, bearing in mind that this is a suit for actual damages, the argument has a fatal weakness. If the respondent had sold in smaller quantities at the higher ceiling price and made delivery by truck, it would have incurred all of the expenses that motivated the differential—invoicing, billing, handling, and transportation. None of these expenses was incurred when the Government requisitioned the pork products. The "loss" in the gross sales figures would have been counterbalanced, to some extent at least, by the additional expenditures. Cf. *Superior Packing Co. v. Clark*, 164 F. 2d 343, 347–48. All this bears on the guiding consideration that recovery in this action must be related to proof of actual loss.

as "just compensation" anything in addition to the ceiling price unless it can "establish a loss based on its total operations during the period relevant to the slaughtering of the hogs from which the requisitioned products were processed" and "determine by reasonable allocations the portion of the loss properly attributable to the goods seized by the Government." Why a loss on total operations must be established in order to show the loss on the hog products requisitioned by the Government is not clear to me. It is the market value of any product that is the basis for "just compensation." If there is no real market value, cost may be an element in the determination of value. Under the circumstances of this case, any other value than the ceiling price is illusory. Consequently I believe that whenever perishable property is taken for public use under controlled-market conditions, the constitutionally established maximum price is the only proper standard of "just compensation."

Five members of this Court express their agreement that replacement cost, if relevant, has been properly found by the Court of Claims. If replacement cost, determined by any accounting system, is a factor, the evidence on which the Court of Claims based its findings of that cost is not before us, and therefore those findings cannot be properly regarded as unsatisfactory. Even if we assume that the evidence offered did not properly allocate costs, the Government raised no such issue by its petition for certiorari or in its brief. The record does show a finding of replacement cost based upon some evidence. In the absence of that evidence from the record, it must be assumed that it would support the findings. If we assume that replacement cost is relevant, to say that a manufacturer who proves that cost by the results of his own system of cost accounting may not retain his award because a more accurate accounting system exists, though not offered in evidence, disregards the salutary rule that

litigants in civil matters must be allowed to frame their issues and prove their cases in trial courts as each desires. This principle includes the introduction of such relevant evidence as each wishes to introduce. Often proof of value or damages is difficult. Courts then reach conclusions from the relevant evidence presented. *Palmer* v. *Connecticut Railway & Lighting Co.,* 311 U. S. 544; *Bigelow* v. *RKO Radio Pictures,* 327 U. S. 251. Findings are properly made on the basis of the relevant evidence heard and are not subject to attack because other available evidence might have been produced. The suggestion of JUSTICE FRANKFURTER's opinion as to a better method for determining replacement cost is futile, since it furnishes a rule, rejected by the majority of this Court, for the Court of Claims to use in determining just compensation. The approval of the method of determining replacement cost used by the Court of Claims by a majority of this Court logically requires a decision on whether or not the ceiling price represents "just compensation."

It may be assumed that the respondent cannot replace the requisitioned hog products at the ceiling price. If respondent was impelled to replace the requisitioned products in its stock, its reasons for so doing lay in the realm of business judgment. There was no legal compulsion. It acted to keep its line of goods complete, to serve its customers and to preserve its good will. Any additional cost to the respondent caused by replacing the products was a consequential damage for which compensation is not given in federal condemnation proceedings. *United States* v. *Petty Motor Co.,* 327 U. S. 372, 378. See *United States* v. *General Motors Corp.,* 323 U. S. 373, 382.

It has been long established that in a free market the market price is the proper criterion for determining "just compensation." *Olson* v. *United States,* 292 U. S. 246, 255; *Brooks-Scanlon Corp.* v. *United States,* 265 U. S.

106, 123. In *Vogelstein & Co.* v. *United States,* 262 U. S. 337, this Court held that the prevailing price in a controlled market was "just compensation." The Vogelstein Company was a wholesaler of refined copper. Between September 28, 1917, and February 1, 1918, the United States requisitioned from the Company 12,542,857 pounds of copper for which it paid 23.5¢ per pound. But this price was not the result of the interplay of supply and demand on a free and open market; it was a price fixed by an agreement made by the War Industries Board with copper producers and approved by the President on September 21, 1917. Vogelstein Company, although not a producer, had apparently cooperated with the producers in the establishment and maintenance of the 23.5¢ price. The Company argued that it was entitled to 26.8¢ per pound—the average cost to it of the copper requisitioned by the United States. This Court concluded that paying the fixed 23.5¢ was correct. "The market price was paid. The market value of the copper taken at the time it was taken measures the owner's compensation." 262 U. S. at 340. Consequently, the judgment of the Court of Claims dismissing the company's petition was affirmed. This acceptance of the fixed price as the market value closely approaches the situation now presented.

It would be anomalous to hold that Congress can constitutionally require persons in the position of the respondent to sell their perishable property to the general public at a fixed price or not to sell to anyone [1] and later to hold that the Government must pay a higher price than the general public where it requisitions the perishable property because of a replacement cost, greater than the fixed price. It is true that the United States by exercising its power of requisitioning compelled the respondent to

---

[1] See *Yakus* v. *United States,* 321 U. S. 414; *Bowles* v. *Willingham,* 321 U. S. 503.

sell to it; but the compulsion to sell to the general public at ceiling prices was hardly less severe. The choice was between sales at the fixed price or, at the best, economic hibernation and, at the worst, economic extinction. The two situations are so parallel that the constitutionally established maximum price may, under the circumstances here, be properly taken as the measure of "just compensation." That lawfully fixed market price determines what the perishable article can be sold for or its market value in any real sense. It gives to the condemnee any profit for increased value in his hands and takes nothing from him that he could lawfully obtain since consequential damages for loss of good will cannot be obtained. Such maximum price is "just compensation." [2]

If the Government fixed prices with the predominant purpose of acquiring property affected by its order, a different situation would be presented. Here we have price regulation of meat products on a national scale with judicial review of those regulations. The Government sought for itself no unique opportunity to purchase.

The respondent, as JUSTICE FRANKFURTER's opinion points out, filed several protests against the Maximum Price Regulations controlling the ceiling prices of hog products. These protests were rejected by the Administrator and review by the Emergency Court of Appeals was not sought. It was during the course of these proceedings that evidence of the profit and loss of the industry and of the replacement cost of pork products could properly be introduced. However, once the maximum price had been set and had not been set aside by direct attack, that price became the only relevant measure of just compensation. Whether normally admissible or not,[3] the replacement cost of perishable articles then subject to price control, bought to maintain the good will of a business,

[2] Cf. *Nortz* v. *United States*, 294 U. S. 317, 328–29.

[3] See Orgel, Valuation Under Eminent Domain (1936) 586.

cannot be an element in the determination of value to fix just compensation. Therefore, evidence of replacement cost in condemnation proceedings such as that before the Court today is irrelevant and should not be admitted.

Mr. Justice Rutledge, concurring.

Six members of the Court agree that the judgment of the Court of Claims must be reversed, but are equally divided in their groundings. Since I am in partial agreement with both groups, I state my own conclusions independently.

It may be, as my brother Reed and those who join with him think, that the ceiling price in a wartime controlled market should furnish the measure of constitutional just compensation for property of a highly perishable nature taken. Perhaps also this view should be qualified further, as by some limitation which would make adjustments beyond that price permissible when the circumstances of the taking are such that they would entail destruction of property values beyond those inherent merely in the property which the Government receives and uses.[1]

But I am also in agreement with my brother Frankfurter and those who concur with him that it is not necessary to reach these important constitutional issues in this case. For I think that, with reference to such perishable commodities taken under circumstances like these, the legal market or ceiling price furnishes at least

---

[1] In some situations the Court has allowed compensation for the destruction of property as being equivalent to "taking" it, cf., *e. g.*, *United States* v. *Welch*, 217 U. S. 333; *Richards* v. *Washington Terminal Co.*, 233 U. S. 546; *United States* v. *General Motors Corp.*, 323 U. S. 373, 384; in others apparently what amounted in effect to destruction has been regarded as infliction of consequential injuries and thus as not compensable, cf. *e. g.*, *Bothwell* v. *United States*, 254 U. S. 231; *Mitchell* v. *United States*, 267 U. S. 341.

presumptively the measure of just compensation, and that this measure should apply unless and until the owner sustains the burden of proving that he has sustained some loss for which he is entitled to a greater award.

That burden, I also agree, the respondent has not sustained in this case. The Court of Claims awarded respondent its "replacement costs," in the view that "when property is taken the owner must be put in as good position pecuniarily as he was in before his property was taken." [2] Payment of the ceiling price did not do this, since as the court pointed out respondent "felt obliged to furnish its customers a certain amount of products, although at a loss, in order to retain their good will and . . . hold its organization together." [3] For this reason it became necessary for respondent to go into the market and purchase live hogs and process them, paying a higher price than it had paid for the hogs from which the products taken had been processed. In this way respondent incurred a loss it would not have incurred had those products not been taken.

On this basis, I agree with MR. JUSTICE REED that the loss is one for consequential damages. That is, it is one to compensate for loss incurred to preserve unimpaired

[2] 107 Ct. Cl. 155, 165. For this grounding the court relied upon citation of *Seaboard Air Line R. Co.* v. *United States*, 261 U. S. 299; *Brooks-Scanlon Corp.* v. *United States*, 265 U. S. 106, 125; *United States* v. *Miller*, 317 U. S. 369, 374; *Walker & Co.* v. *United States*, 105 Ct. Cl. 553. The quoted statement, of course, taken abstractly, is broad enough to permit the award of consequential damages, an effect contrary to this Court's consistent rulings. See the authorities cited in note 4.

[3] 107 Ct. Cl. 155, 165. The record before us contains no proof that replacing the requisitioned goods was essential to prevent respondent from going out of business or that the loss of good will entailed by the taking, if not repaired by replacement, would have prevented continued employment of respondent's employees or disrupted its organization.

respondent's good will,[4] not to compensate for any value lawfully obtainable for the articles then or prospectively within any reasonable future period, in view of the property's perishable nature, from other sources.

But respondent asserts its claim to "replacement value" on a different theoretical basis, *i. e.*, not as compensation for loss incurred in preserving good will, but as the proper measure of the value of the property when requisitioned. And if market price, here ceiling price, is not the measure of compensation, it is said "replacement cost" furnishes the best substitute or at any rate an appropriate element for consideration.

The difference in the present circumstances would seem to be highly verbal. For in any event the loss was actually incurred for the purpose of keeping respondent's customers satisfied and thus preserving its good will unimpaired; in other words, to prevent the accrual of injury consequential to the taking.

It is true that in circumstances where there is no market value, "replacement cost" has been held appropriate for consideration in reaching a judgment concerning the value which is just compensation. But this seems to me a different thing from allowing such proof, when the loss it reflects has been incurred solely to prevent consequential injury, and there is a market value presumptively valid to compensate for all losses incurred except that loss. To allow that proof in these circumstances would be in substance if not in form to permit an award for elements of consequential damages entirely out of line with the policy of this Court's prior decisions concerning compensation for such injuries.[5]

---

[4] See *United States* v. *Petty Motor Co.*, 327 U. S. 372, 378, and authorities cited; cf. *United States* v. *General Motors Corp.*, 323 U. S. 373, 383.

[5] See authorities cited in note 4.

The considerations set forth by my brother FRANK-FURTER respecting the difficulties, indeed the near impossibility, of proving costs in this case would seem to support this conclusion. Accordingly, I concur in the judgment of the Court.

MR. JUSTICE JACKSON, with whom MR. JUSTICE DOUG-LAS joins, dissenting.

It would appear that this Court in this case is exceeding the limitation placed by Congress on its review of Court of Claims decisions. 28 U. S. C. § 288; 53 Stat. 752. The Court does not decide, as Congress has authorized it to do, that any finding of the Court of Claims is not supported by substantial evidence, or that the ultimate findings lack support in evidentiary findings, or that there has been a failure to make findings on the material issues. Instead, in effect it sets aside the judgment below on its own interpretation of "recognized facts in the meat industry." Of these it takes judicial notice on the basis of an assortment of publications which, whatever their merits if called to the attention of the court below, should not in this Court outweigh specific findings of fact by the Court of Claims based on evidence before it.

Taking the facts as found by the Court of Claims, the case is this: Claimant was a meat packer and among its products were pork chops. The Government set a maximum price at which pork chops could be sold. It set no maximum price on the two principal factors in the cost of pork chops, *viz:* live hogs and labor. The result was that claimant's uncontrolled costs mounted until, on what is found to be a fair allocation of costs between chops and other products of the hog, it was costing more to produce the pork chops than the price for which claimant was permitted to sell them. But there were certain collateral benefits derived from supplying old patrons, even at a loss, to avoid heavier losses from shutting down

the business and to keep customer good will for the hoped-for day of normal business.

However, the Government decided to buy claimant's chops. It offered the maximum OPA price. As there was no such compensating advantage to the packer in selling its choice cuts to the Government at a loss, as in keeping its business going with its general customers, it refused the offer. The Government then seized its pork chops and the company now claims the "just compensation" which the Constitution guarantees to those whose private property is taken for public use. The Government contends, and the practical effect of the Court's holding is, that the company can recover only the maximum price fixed for its products by the Office of Price Administration, in spite of the finding that this is less than it cost to produce or to replace them.

It is hard to see how just compensation can be the legal equivalent of a controlled price, unless a controlled price is also always required to equal just compensation. It never has been held that in regulating a commodity price the Government is bound to fix one that is adequately compensatory in the constitutional sense, so long as the owner is free to keep his property or to put it on the market as he chooses. If the Government were required to do so, the task of price regulation would be considerably, if not disastrously, complicated and retarded. It seems quite indispensable to the Government itself, for the long-range success of price controls, that fixed prices for voluntary sales be not identified with the just compensation due under the Constitution to one who is compelled to part with his property.

The war did not repeal or suspend the Fifth Amendment. *United States* v. *New River Collieries,* 262 U. S. 341, 343; *United States* v. *Cohen Grocery Co.,* 255 U. S. 81, 88. But it is obvious that the constitutional guaranty of just compensation for private property taken for pub-

lic use becomes meaningless if the Government may first, under its "war powers," fix the market price and then make its controlled figure the measure of compensation.[1]

It must be remembered that market price, as such, is not controlling. The Fifth Amendment's "exact limitation on the power of the government"[2] is not market price—it is just compensation. The former is relevant, and this Court has so considered it, only because, in a free market, it is perhaps the best key to value at the time of taking. Original cost and replacement cost yield to it only because of that factor. But here, there is no true market price[3] to provide the usually accepted standard of value. The relevance of original cost and replacement cost, even in this situation, cannot seriously be denied. In the absence of an over-riding free-market

---

[1] Such a rule hardly squares with the doctrine laid down by this Court more than fifty years ago that "the compensation must be a full and perfect equivalent for the property taken," *Monongahela Navigation Company* v. *United States,* 148 U. S. 312, 326, or later expressions that "the owner shall be put in as good position pecuniarily as he would have been if his property had not been taken," *Seaboard Air Line R. Co.* v. *United States,* 261 U. S. 299, 304; *Olson* v. *United States,* 292 U. S. 246; *United States* v. *Miller,* 317 U. S. 369.

[2] ". . . in this Fifth Amendment, there is stated the exact limitation on the power of the government to take private property for public uses." *Monongahela Navigation Co.* v. *United States,* 148 U. S. 312, 325.

[3] The price approved as just compensation in *Vogelstein & Co.* v. *United States,* 262 U. S. 337, was fixed by agreement between the Government and the producers, represented by a committee whose members Vogelstein had nominated, and helped to elect, to represent the industry. Thus that price is not comparable to the Government-dictated price involved in this case. In the *Vogelstein* case, this Court said: "Appellant's contention that there was no market price other than that fixed by the fiat of the United States is without support. . . ." 262 U. S. 339. And, further, "The finding of the Court of Claims is plain and cannot be read as referring to a mere fiat price." 262 U. S. 340.

price, the courts must turn to the soundest standards otherwise available.

We think the Court of Claims made no error of law in thinking that the controlled market price for voluntary sales was not the measure of just compensation for the seized pork chops. Limiting our review to the scope which Congress has authorized, we find no error in its calculation of just compensation for the purposes of complying with the constitutional requirements.